ROBERT G. BAUMAN, ET AL, dba SOMERSET
CO-VENTURE and ROCK CREEK 185, LTD.
*v.* DEPARTMENT OF REVENUE

Roger A. Nelson, Portland, represented plaintiffs.

Alfred B. Thomas, Assistant Attorney General, Salem, represented defendant.

Decision for defendant rendered May 26, 1976.

CARLISLE B. ROBERTS, Judge.

The plaintiffs appealed from defendant's Order No. VL 75-302, dated June 4, 1975. The issue before the court is the true cash value as of January 1, 1974 (the assessment date for the property tax year 1974-1975), of a 388-unit apartment complex located in Washington County, Oregon, known as the Rock Creek Apartments, Assessor's Account Nos. 42700-0111 and 42700-0190 (the latter previously designated as Account No. 41825-1905 by the Washington County Department of Assessment and Taxation). The total site included 19.23 acres.

The defendant's order affirms the value of the improvements on the assessment roll, $3,801,000, and defendant's answer prays that this be sustained. The plaintiffs' complaint prays that the true cash value

of the complex's improvements as shown on the assessment roll be reduced to $2,219,700. At the trial, defendant changed its approach to value, substituting cost as more reliable than income, and asserted a value for the improvements of $4,405,700. (The parties agreed that the value of the land only was $263,300.)

The improvements consist chiefly of an apartment complex which was completed after the assessment date. It was built in four phases: Phase I, completed in 1971, and Phase II, completed in mid-1972, consisted of 153 apartment units and a large recreation center. In April 1973, construction of the 235 apartment units comprising Phases III and IV was begun, the seven similar apartment buildings comprising these latter two phases being started seriatim, at intervals of 30 or 40 days.

Although physically expanding, the Rock Creek Apartments were in serious economic straits on the assessment date. For the preceding year, there had been a 31 per cent vacancy rate[1] and the owners were at least $225,000 delinquent in their mortgage payments.

In valuing the complex, the parties' expert witnesses adverted to each of the three accepted methods of valuation. Unhappily, because of the special circumstances involved, the market data, the income, and the cost approaches were not capable of yielding a truly satisfactory result. The plaintiffs and defendant were in agreement that the only way to value Phases III and IV was through the cost approach because they were still under construction on the assessment date. However, the plaintiffs rested their case

---

[1] This vacancy rate is on a dollar basis. Since different sized apartment units did not rent for the same amount, a dollar-basis vacancy rate is used to reflect the total dollar loss incurred as a result of an unused apartment. All vacancy rates referred to herein are on a dollar basis.

as to Phases I and II on the income approach (as had the assessor), while the defendant finally relied on the cost approach.

An initial problem that must be resolved by the court in applying the cost approach is to determine, as best it can, the percent completion of Phases III and IV on the assessment date. Both parties have applied the percent completed on the assessment date to the total cost of these parts of the project, and their differences must be resolved. The plaintiffs used a 60 percent completion figure, while the defendant, basing its figure on the testimony before its hearing officer, used a 75 percent completion figure.

Mr. Robert Bauman, part owner of the Rock Creek Apartments and the developer who had prime responsibility for construction of the subject property, provided the only evidence measuring the portion of the project completed as of January 1, 1974. His testimony was based on on-site inspections that occurred continuously throughout the construction period. He testified that the project was 50 to 60 percent complete on the assessment date. On cross-examination, he was asked as to the percentage of completion of each of the seven buildings comprising Phases III and IV. (The defendant's contention was that, since each of the buildings was roughly equal in value, an average of the percent completed for all seven buildings could be employed.) The average percent complete, calculated by the court from the testimony, turned out to be approximately 80 percent. However, Mr. Bauman, while under the pressure of cross-examination, derived these percent complete figures by estimating the date when each building was started and completed. He remedied this weakness by later testifying more specifically as to the beginning and ending dates of construction of each building. Assuming uniform additions to cost during the entire construction

period, as did Mr. Bauman, the court has calculated that the project was approximately 60 percent complete on January 1, 1974.② Mr. Bauman also testified that, by the end of the year 1973, the contractors had received $1,455,300 of a draw totaling approximately $2,455,300, indicating that 59 percent of the project had been completed on the assessment date. The court therefore finds, that, on the assessment date, Phases III and IV were 60 percent complete.

*Plaintiffs' Cost Approach.* As their expert witness using the cost approach, the plaintiffs called Mr. Roy M. Howard. He has had 25 years' experience as an appraiser and a real estate consultant and operates his own company, Real Estate Data Services. For Phases I and II, he used a cost figure of $2,538,160. He depreciated Phase I by 5 percent and Phase II by 2½ percent as applicable to the two years and one year of depreciation attributable to each phase, respectively. The deduction of the $98,160 depreciation charge produced a cost value for Phases I and II of $2,440,000. The total anticipated cost of Phases III and IV (as testified to by Mr. Bauman) was $2,425,500. Since Phases III and IV were 60 percent complete, their indicated value was $1,455,300. Mr. Howard's total estimate of value for the improvements was $3,895,300, which is the sum of $2,440,000 and $1,455,300.

The court is critical of Mr. Howard's $98,160 depreciation charge, based on a 40-year life of the buildings, taking 2½ percent per year depreciation to each unit. An appraiser may not properly deduct depreciation based on a simple estimate of the life of the building. This is not an income tax question where

---

② Assuming that a project was started and completed at the first of the month, 62 percent completion is indicated. Assuming that a building was started and completed in the middle of the month, a 58 percent completion is indicated.

there is a right to recover a capital expenditure through depreciation of a wasting asset. In property valuation, accounting depreciation "should be used by appraisers with great caution." *Encyclopedia of Real Estate Appraising* 77, n 1 (Friedman ed, rev & enlarged ed 1968). Deductible depreciation must be based on a physical examination of the property (accompanied, if indicated, by consideration of economic and functional depreciation) and there is no indication in the record that this was done. *Id.* In addition, the cost of buildings constructed one and two years ago has now increased, but there was no attempt by the witness to trend these costs to the assessment date, offsetting some or all of the depreciation taken. For this reason, the court finds that the $98,160 depreciation deduction cannot be allowed. Plaintiffs' cost approach for only the improvements would therefore be the sum of $1,455,300 and $2,538,160, which is $3,993,460.

*Plaintiffs' Mixed Income and Cost Approach.* Although the plaintiffs used a cost approach as to Phases III and IV, their case was principally based on employing an income approach as to Phases I and II. They argued that the income approach was a better approach to value because it better reflected market realities. For Phases I and II, a value of $1,159,000 for the improvements was sought. Adding this figure to the cost value for Phases III and IV of $1,455,300, plaintiffs submitted a total true cash value of $2,614,300. (A very similar approach was used by defendant's only witness, Mr. Strong, before the Washington County Board of Equalization and the Department of Revenue's hearing officer, but was specifically abandoned by him in favor of the cost approach in this proceeding.)

In developing the income approach, Mr. Howard attempted to adjust the income and expenses for

Phases I and II during 1973 with respect to specific items which he deemed abnormal. The actual income for the project for 1973 was $269,000, which represented a 31 percent vacancy rate. Mr. Howard was asked by one of the banks that had financed the project to examine the undertaking to see how it could be revitalized. He restructured the rental rates so that at a 100 percent capacity the income would be $387,240, but allowing for a realistic vacancy rate of approximately 20 percent, the actual expected stabilized income was projected at $308,824, more or less.

To normalize expenses for the project, Mr. Howard started with the actual 1973 maintenance and operating expenses of Phases I and II of $172,000. From this sum, he deducted what he determined to be excess maintenance cost of $12,450 and excess advertising cost of $15,450. The amount of these charges was not well supported by the evidence.[3] Mr. Howard made two further adjustments (additions to expenses): a land charge of $22,563 and a personal property charge of $6,138.[4] He then arrived at normalized expenses

[3] Mr. Paul E. Christensen, president of Property Management Services, Inc., testified for the plaintiffs as to "normal" maintenance and advertising expenses. Mr. Christensen's organization manages 55 apartment complexes in the Northwest with an average size of 100 apartments. It manages all of the apartment complexes with over 300 units in Oregon, and all but one of the complexes over 200 units. He testified that the "normal" maintenance expense was 2 percent of gross income. He also testified that a "normal" advertising expense for an isolated unit was 3 percent of gross income. The actual 1973 maintenance expense was $17,852 and the actual advertising expense was $21,050. Applying the 2 and 3 percent figures to either the actual 1973 income of $269,000, the maximum normalized income of $387,240, or the realistic normalized income of $308,824, the adjustments of $12,450 and $15,450 are not supported. The court believes that Mr. Howard should have used the $308,824 estimated income, and would therefore have arrived at an adjustment for maintenance of $11,676 and for advertising of $11,786.

[4] Since the capitalization rate did not include the recovery for the investment in land or personal property, the court be-

of $173,210.[5]  Subtracting the normalized expenses of $173,210 from the normalized gross income of $308,824, a normalized net income of $135,614 was found. This was capitalized at 11.7 percent, which included a 2.7 percent assessment rate, to arrive at a value for the improvements of $1,159,000.

■■  The court cannot place much weight on the income approach used by the plaintiffs. The income approach should be based on enough historical data so that a normalized expected income can be determined with confidence. Most experts believe that three to five years, preferably longer, of income experience are needed to make such an estimate. *Shields v. Dept. of Rev.*, 266 Or 461, 513 P2d 784 (1973); *Valley River Center v. Dept. of Rev.*, 6 OTR 368 (1976); *Encyclopedia of Real Estate Appraising* 642, *supra;* Harris, Kerr, Forster & Company, *Economic Factors and Case Studies in Hotel and Motel Valuation* 28 (2d ed 1968.[6] Phase I, the older of the first two phases completed by January 1, 1974, the assessment date, barely had two years of experience. To normalize gross income and expenses, the actual 1973 income of $269,000 had to be adjusted to $308,824, and the actual 1973 expenses of $172,000 had to be adjusted to $144,100 (not includ-

lieves these charges were probably made for that purpose. However, the land charge appears to be much too high. Using the $263,300 land value, and dividing it by the actual land charge, a recovery in 11.67 years was indicated. This is much too rapid. Using the $100,000 estimate of the value of personal property made by Mr. Strong, this would indicate a 16.29-year recovery rate for personal property. This is faster than the land charge and a very long time for personal property. The court does not know what Mr. Howard had in mind when he made these charges. His failure to explain them weakens his testimony.

[5] $172,000 less $12,450 and $15,450, plus $22,563 and $6,138, should be $172,801.

[6] This edition, originally copyrighted in 1968, again in 1974, contains compiled data only through 1966.

ing the land and personal property charges). These large adjustments do not indicate a stabilized income stream.

In addition, this approach attempts to treat Phases I and II as a single economic entity, but they cannot be separated from the addition of Phases III and IV in the contemplation of a prospective purchaser. The additions of Phases III and IV will certainly affect occupancy rates of I and II, as well as allowing certain expenses, like those associated with the recreational facilities which are designed to serve the entire 388 units, to be spread between all the units and not just applied to the 153 units in Phases I and II. The income approach cannot effectively be used to value part of an organic whole. I Bonbright, *Valuation of property* 226 (1937).

*Defendant's Cost Approach.* To present the cost approach for the Department of Revenue, Mr. Larry Strong, a certified property appraiser employed by the Washington County Department of Assessment and Taxation during the last $4\frac{1}{2}$ years, was called as an expert witness. Using the 1970 edition of the Department of Revenue's cost factor manual for commercial buildings, and assuming that Phases III and IV were 75 percent complete, he arrived at a total value for the improvements of $4,405,730. (Upon adjusting this figure consistently with the court's ruling that Phases III and IV were 60 percent complete, a value of $3,996,380 is indicated.)[7]

Mr. Strong did not make any adjustments for depreciation, nor did he trend the cost figures to a 1974 base. He did not indicate whether this was a result

---

[7] The cost factor book indicated a value for Phases III and IV, when completed, of $2,729,000. To adjust from a 75 percent to a 60 percent completion figure, 15 percent of $2,729,000, or $409,350, must be deducted from the $4,405,730 figure.

of a conscious decision on his part that the two factors would offset each other. It is observed that Mr. Strong's cost figure, $3,996,380, and Mr. Howard's cost figure of $3,993,460, as adjusted by the court, are less than $3,000 apart.

*Defendant's Market Approach.* The third and final approach used to value subject property was the market approach. This approach was used solely by the defendant. There was only one sale offered in evidence, the sale of the subject property on October 1, 1974 (with an agreed effective "closing date" of June 1, 1974). The total sale price was $6,167,182. Defendant made a number of adjustments to work back to an indicated value of the improvements as of January 1, 1974. The estimated value of the personal property, $100,000, and the cost of completing Phases III and IV were deducted. Mr. Strong multiplied $2,325,500, the builder's (not Strong's) reported cost of Phases III and IV, by the 40 percent needed to complete it, to arrive at a deduction of $930,200. Mr. Strong's figure of $2,325,500 appears to be $100,000 too low, because the plaintiffs have constantly asserted the cost of Phases III and IV was $2,425,000. Therefore, the court makes an additional deduction of $40,000 (40 percent of $100,000). The assessed value of the land, $263,300, must also be deducted. Using the market approach, Mr. Strong's indicated value for the improvements, as adjusted by the court, would be $4,833,682.

The court notes that Mr. Strong did not rely on this sale, preferring to use the cost approach. The court also is unable to place reliance on this sale. It occurred too many months after the assessment date and after major changes in the property had taken place. The property had been completed and was no longer under construction. The bank, through Mr. Howard, had provided technical advice which made the

property more saleable. Generally, sales occurring after the valuation date, to be deemed "comparable," may not contain elements of value that were unknown on the applicable assessment date. *Carl v. Dept. of Rev.* 6 OTR 347 (1976). In addition, Mr. Howard testified that he did not believe that this was a market sale. No rebuttal testimony was brought out by the defendant to counter this charge; in fact, there was no testimony whatsoever that this was a sale between a willing buyer and a willing seller or that it was conducted at arm's length. For these reasons, little reliance can be placed on data from this transaction.

The market data and income approaches are not regarded by the court as providing valid indications of value of the subject property. This leaves only the cost approach, with all its problems. The subject property had a vacancy rate for the year immediately preceding it of 30 percent and was obviously in trouble. In addition, the project was apparently unable to generate enough cash to meet mortgage payments. Under such circumstances, it would appear that the cost approach, as applied to Phases I and II, would also be a poor indicator of value. The court wishes that a sound method was available to arrive at a reasonable discount to the cost of this property. In its absence, the court is forced to rely on an unadjusted cost approach. Because, in this instance, the actual costs experienced by the plaintiffs are probably more reliable than those found in the cost factor book, the court finds that the value of the improvements on subject property on January 1, 1974, was $3,993,460.

The court is now confronted with an additional question. It has found that the improvements' value, according to the preponderance of the evidence, was $3,993,460, yet the Department of Revenue, in its order, had confirmed a value of $3,801,000. The question was presented (and subsequently briefed) by counsel:

whether this court can properly find a higher value for the property than was found and ordered by the Department of Revenue after its own hearing?

The Department of Revenue contends that, under ORS 305.435, the Tax Court has the power to raise the assessment:

"\* \* \* The court may affirm, reverse, modify or remand any order of the department, and shall grant such other relief, invoke such other remedies and issue such orders in accordance with its decision as shall be appropriate in a court of general jurisdiction."

While this statute gives the court great powers, it does not clearly support the defendant's thesis. The department also cites *Georgia-Pacific Corp. v. State Tax Com.*, 228 Or 112, 363 P2d 1105 (1961), in support of this position. In that case, the Oregon Supreme Court held that the State Tax Commission, the predecessor of the Department of Revenue, had the power to increase a board of equalization's property assessment, affirming an assessor, although the petitioner pleaded for a reduction of the assessed value. The Supreme Court quoted the trial court verbatim, at 122:

" 'No cases have been cited that hold that the State Tax Commission *or the* [*trial*] *Court* cannot determine from the evidence "true cash value" of the particular property, or part thereof covered by the appeal, after the Assessor's "true cash value" is determined to be wrong, even though the determined "true cash value" exceeds the value appealed from as to one or more particular items. The Commission's duty is to find "true cash value" as well as uniformity and equality in taxation.' " (Emphasis supplied.)

In spite of its reference to the trial court, *Georgia-Pacific Corp.* does not constitute an explicit holding

that the Tax Court has the power to increase an assessed value. It can be argued that there is dictum in the case which indicates the court has such power, but a close reading of the entire case shows that the court's words may have been misinterpreted. When the trial court stated that no case had been cited to it that indicated that the court could not find true cash value, it was merely stating that, upon review, the court could find a true cash value that would affirm the increased value found by the State Tax Commission. The case really revolves around the State Tax Commission's increase in assessment, not an increase found by the trial court.

■ The Department of Revenue's power to increase assessments is well founded in the statutes. ORS 305.090; 306.111; 309.400; *Venturacci v. Dept. of Rev.*, 6 OTR 194 (1975); *Balderee v. Commission*, 2 OTR 142 (1965). The department's supervisory powers allow it to equalize values throughout the state and to correct any instances where assessed values fall below true cash value. The Tax Court has no supervisory powers under which it can initiate increases of value. Under ORS 305.425, the proceedings in this court are tried de novo; *i.e.*, a new trial as to the admission of evidence, but on the same issues as were presented to the administrative tribunal. It must find the alleged true cash value shown by the preponderance of the evidence *and within the scope of the pleadings*.

It seems improper for the defendant to seek to increase an assessment in this court without pleading it. The court finds an analogy here with the pleading of special damages.

"While in the averments of damages it is not necessary to be exact * * *, it is essential that the sum stated in the conclusion be sufficient to cover the amount of plaintiff's real demand, for in gen-

eral the complainant cannot recover greater damages than * * * he has declared for and demanded in his pleadings, nor may the award include amounts not embraced within the averments of the complaint. * * *" 22 Am Jur2d *Damages* § 276.

The same reasoning, designed to prevent unfair surprise, is applicable to the defendant's answer. *See Smith v. Pallay et al.*, 130 Or 282, 290, 279 P 279, 282 (1929). If, subsequent to the issue of its order from which appeal is taken to the Tax Court, the administrative agency, through further study, believes that the true cash value of the subject property on the assessment day should be increased, it should affirmatively plead the increased amount.

The court's view of the matter is fortified by its observation that, on appeal, the assessing official's expert witness, finding himself challenged in court, almost regularly supports his initial position by finding a higher value than that determined at the administrative hearing. This is a temptation easily available to the witness, who must of necessity depend on experienced judgment to make his initial subjective selection of value factors which, in turn, involve infinite degrees. It is always possible for him to select the next degree which will "strengthen" the proposition that the property is "certainly worth not less than" the value pleaded in the answer.

The defendant pleaded to affirm the value of the improvements as found by the county board of equalization, $3,801,000 (according to defendant's opinion, No. VL 75-302). The plaintiffs were not given notice through the pleadings of any intent by defendant to assert a higher value. In *People v. O'Donnel*, 198 NY 48, 91 NE 276, 277 (1910), the New York Court of Appeals made the following statement:

"* * * When he [the plaintiff] takes the assessment into court, asking for a reduction thereof,

440

there is nothing in his action which implies a consent to have the assessment increased or a willingness to litigate that question, nor can the action of the commissioners of taxes and assessments in resisting his application for a reduction reasonably be construed into a notice from them that they will ask for an increase. * * *"

This court is not ready to claim jurisdiction to assess a higher value than pleaded.

■ In the present case, the difference between defendant's asserted value and that found by the court, based on the preponderance of the evidence ($3,993,460), is only about five percent, clearly within the "range" of true cash value as generally understood,[9] and it supports defendant's affirmance of the assessed value of the subject property as of January 1, 1974. By the same token, there is no reason to remand the question of value for further consideration by the Department of Revenue, as suggested by defendant's brief.

Defendant's Order No. VL 75-302, holding that the property's improvements were correctly valued at $3,801,000, is hereby affirmed. No costs to either party.

[9] It is obvious that an expert appraiser of real property cannot be expected to defend the precise dollar value attributed by him to a specific property. His work is necessarily based on a subjective judgment of a number of indicators of value which he must correlate. The problem of the reasonable limits on a "range" of true cash value is briefly discussed in *Pacific Building v. Commission*, 2 OTR 52, *aff'd*, 241 Or 525, 407 P2d 263 (1965), and cases cited therein.