Argued April 7, affirmed September 12, 1978

## CABAX MILLS, *Respondent,*
*v.*
## DEPARTMENT OF REVENUE, *Appellant.*
### (TC 1049, SC 25461)
583 P2d 1128

Alfred B. Thomas, Assistant Attorney General, Salem, argued the cause for appellant. With him on the briefs was James A. Redden, Attorney General, Salem.

Vernon D. Gleaves, Eugene, argued the cause for respondent. With him on the brief were Thomas M. Allen, and Butler, Husk & Gleaves, Eugene.

Before Holman, Presiding Justice, and Howell and Lent, Justices, and Joseph, Justice pro tempore.

HOWELL, J.

## HOWELL, J.

The defendant, Department of Revenue, appeals from a decree of the Tax Court establishing the market value of approximately 31 acres of land owned by plaintiff in Lane County. Approximately two-thirds of the land is occupied by a mill pond and the balance by a plywood mill. The property described as Tax Lot 2800 was determined to have a value of $291,000 as of January 1, 1975.

We have examined the record, and we agree with the Tax Court that the plaintiff has established its suit by the required quantum of evidence. We therefore adopt the material portion of the opinion of the Tax Court.[1] As the opinion was unpublished, it is reproduced below:

"There remains to be determined by this court the value of Tax Lot 2800 for which the assessed value as of January 1, 1975, was $472,200, affirmed by the board of equalization and reaffirmed by the Department of Revenue. In its complaint, the plaintiff pleaded a value of $197,210. As will be seen below, plaintiff's appraisal expert found a value of $291,000 and defendant's appraisal expert contended for a value of $670,440 (which was not pleaded). (Such an array of values, each seriously urged by responsible, painstaking, presumably expert appraisers, together with the history of the appraisals of the other lots, must raise questions in the reader's mind as to the efficacy of the system for determining property values for tax purposes.)

"The subject property, Tax Lot 2800, is a fairly level parcel of about 31.48 acres (defendant's testimony) or 32.58 acres (plaintiff's testimony) in size. It is known

---

[1] Three other tax lots were involved in the suit but were compromised in the Tax Court and are not involved in this appeal. It is interesting to note, as the Tax Court did in its opinion, that the value of one was reduced from $47,000 to $2,650; by a stipulation the assessed value of another was increased from plaintiff's claimed value of $195,000 to $250,000; and for the third tax lot, the assessed value was reduced from $49,000 to $8,000.

as the 'main logging pond site.' Approximately two-thirds of the site is covered by a millpond with an average water depth of six feet over another two feet of mud and bark. The other one-third of the area is used as part of a plywood millsite. The log pond is an integral part of the complex, being used both by the plaintiff and by the Barker-Willamette Lumber Company, Inc. (a corporation with the same ownership and management as the plaintiff), as a holding, sorting, and a 'wet' cold deck log storage area.

"The question presented to the court related chiefly to the value to be given to the acres of millpond. In the view of the plaintiff, it represented an example of economic obsolescence (although that term was not used in argument). From the standpoint of the defendant, as an integral part of the operation, its value per acre was the same as the graded, stabilized dry land which surrounded it.

"The plaintiff's first witness was Mr. William F. Berry of Springfield. This witness had a Bachelor of Science in forestry management from the University of Washington, had served the State Department of Forestry for 11 years, and had been timber and logging manager for the plaintiff beginning in September 1976. He testified that, with modern equipment, logs were better and more efficiently handled with dry land storage and that ponds are no longer being constructed on new millsites and are gradually being reduced on older facilities. Dry log storage gives greater flexibility in sorting logs on arrival at the site as to size, species and grade, and for scaling for net volume (as opposed to scaling on the truck). A much smaller area of land would be required for this purpose as compared to millpond area because of the modern capability for cold decking such logs after sorting.

"Plaintiff's second witness was Mr. Leroy Maxwell of Springfield, a civil engineer graduated by Colorado State University in 1959 and employed by the plaintiff during the last five years as its construction engineer

on the millsite and in the woods. He also testified that the construction of log ponds is and has been outmoded for the last four or five years. The necessary cleaning and management of a pond is expensive but to transform the plaintiff's pond into a stable, dry land working area is not economically feasible. The pond was formed by excavation and by utilizing the earth thus removed to build dikes along the perimeter. On request of the plaintiff's management, the witness had studied the cost of converting the pond into a dry land working site and had determined that to drain the basin, under DEQ standards, would require settling basins to be constructed. In addition, there would be costs of pumping, of removal of the settling pond debris, the excavation of two additional feet of the pond bottom (estimated at 71,000 cubic yards) and hauling it away, and filling the pond area with 283,947 cubic yards of material. He estimated the cost as of January 1, 1975, to be $1,053,042 plus additional costs for base and paving.

"The plaintiff's third witness was Mr. Charles P. Thompson of Eugene, a real estate appraiser and broker, a graduate of the University of Oregon in 1960, after which he was a mortgage loan officer and appraiser for State Finance Company, Salem, for five years, then a mortgage loan manager in Eugene, and, since April 1965, has been engaged in the general practice of real estate, selling, managing, and appraising real property. He has taken numerous appraisal courses, has served substantial clients, has testified as an expert witness in Oregon courts and courts out of state, and is a qualified instructor, approved by the Society of Real Estate Appraisers (S.R.E.A.), lecturing at the University of Oregon and other places. He has substantial professional affiliations and is designated a Senior Real Property Appraiser by the S.R.E.A. and M.A.I. by the American Institute of Real Estate Appraisers (the two leading national associations).

"He accepted the engineering estimate of Leroy Maxwell, dated May 27, 1976, indicating the cost to fill

and return the pond to matching ground area to be $1,053,042 or $47,865 per acre. He found that industrial land sales in the Eugene area, zoned M-3, five acres and more with city water and sewers available, range from a low of $5,000 per acre for the larger sites (20 acres and up) to $20,000 per acre for the smaller sites (10 acres and less, down to five acres). He concluded:

" '* * * Small industrial sites, typically ½ acre to 3 acres in the Eugene Industrial Park, which lies across 5th Avenue from the subject, have sold for as high as $1.00 per square foot. Such small sites typically sell for 50¢ to 75¢ per square foot in other industrial parks. The subject is in the category of large industrial sites, and the fill cost exceeds $1.00 per square foot. Therefore, the fill cost alone exceeds the value (if filled) by a factor of over 3, which renders the concept of filling totally unfeasible from an economic standpoint. Thus, there are only two apparent land uses which would find possible utility in a pond. These uses are (1) some form of timber manufacturing and (2) sanitary landfill, which is not feasible within the city limits of Eugene [where subject property is located].'

"Mr. Thompson's own studies convinced him that 'sawmilling is the only probable industrial use which could make use of the existing pond,' and, therefore, 'the highest and best use of the suject land is concluded to be that of sawmilling or some form of timber manufacturing. * * *'

"As a result of his studies, he concluded that while the highest and best use of the subject property was some form of timber manufacturing, even this use is far from ideal and that it is obvious to him, as an appraiser, that the pond area has substantially less utility than the surrounding industrial land and is, therefore, of less value.

"With these conclusions in mind, he sought sales of comparable properties, specifically comparable in that the property contained old log ponds or required filling in order to attain the stage of utility required of heavy industrial property. All of his sales were in the M-3

[ 342 ]

(heavy industrial use) zone. He reached several conclusions: The trend is toward dry storage, for more efficient handling of logs with modern machinery. In-city locations are not desirable for sawmills. Pond area has less utility than the surrounding industrial lands and therefore should be accorded a lower value.

"Based upon his findings, the witness gave a value of $15,000 per acre to the 10.58 acres of the subject property which is stabilized dry land, for a total of $159,000 (rounded). He gave a value of $6,000 per acre to the log pond, based on comparable sales, for a total of $132,000. His opinion of the total value of the subject property as of January 1, 1975, was $291,000.

"Defendant's sole witness was Mr. Thaddeus F. Lewandowski, a graduate of the University of Nebraska in 1961, where he took courses in surveying, drafting, mapping, real estate principles, business law and real estate law. He was in the U.S. Air Force for 18 years but is presently, and for the last seven years, has been employed by the Lane County Department of Assessment and Taxation, specializing in land appraisals. He was assigned to appraisals in industrial property in July 1976, but has not hitherto appraised properties of the woodworking industry. He is an Oregon certified appraiser and, beginning in 1974, became a candidate for the C.A.E. designation of the International Association of Assessing Officers. He has taken five appraisal courses conducted by the Department of Revenue and Oregon State University and four I.A.A.O. correspondence courses. He has defended many appraisals before the county board of equalization and has had some experience as a witness in court.

"He found the highest and best use for the property was its continued use for heavy industrial purposes. It was his opinion that the logs used by plaintiff were chiefly of large dimension and clear grade so that a millpond was a better and more economical method of handling such type and size, instead of machine

handling. He also testified that the pond could be easily drained and returned to its former grade; however, he had not made a study of this project and had no cost figures on draining, debris removal, necessary fill and land stabilization.

"Consequently, he used as comparable sales those properties which were in heavy industrial use in the immediate neighborhood or within a mile, more or less, of the subject property. The sale he deemed most comparable was industrial property without a log pond or need for fill. He concluded that the sales established a value of $15,000 an acre for raw industrial land (including a pond) in the immediate area of the subject property and that the sales supported an added increment to the land, at $10,500 an acre, for 'site development costs to improve properties.' Also, he concluded that since the highest and best use for the approximate 21.48 acres in use as a millpond was its use as of the assessment date, the dike and two roadways into the pond are improvements to the land which, based on cost of construction, should be added as an increment. He therefore found: 31.48 acres of $15,000 an acre, $472,200; site development costs of the 10-acre plant site, at $10,500 an acre, $105,000; dikes and roadways for the millpond, $93,240; a total for the subject property of $670,440.

"This analysis was apparently made in preparation for this trial. As stated above, the county's original assessed value as of January 1, 1975, was $472,200 and this was affirmed by the Department of Revenue in its Order No. VL 76-154. There was no affirmative pleading of the new value by defendant. The court recognizes this is a trial de novo and that testimony can be presented which was not placed before the Department of Revenue at its hearing. It is the view of the Tax Court that it must find the true cash value shown by the preponderance of the evidence *and within the scope of the pleadings. Bauman et al v. Dept. of Rev.,* 6 OTR 426, 438 (1976). The question before the court, then, is whether plaintiff's opinion of value of

$291,000, as testified to by its witness, or the defendant's view of $472,200, has been proved by the required preponderance.

"Both expert appraisers agreed on the $15,000 an acre value for the stabilized property on which improvements had been built and which surrounded the millpond. But defendant's added increment to the land of an additional $10,500 an acre for 'site development costs' was not made sufficiently clear in the testimony or in the defendant's Exhibit A (a written appraisal report) to stand up against the analysis of sales made by the plaintiff's expert witness. And defendant fell far short of proving that the millpond itself should be valued at $15,000 per acre plus $93,240 for dike and roadways.

"The court finds that the true cash value as of January 1, 1975, of the subject property's 10.5 acres of stabilized land was $159,000. The true cash value of the 22 acres of log pond as of the assessment date, at $6,000 per acre, was $132,000. The total of $291,000 represents the true cash value as of January 1, 1975."

We affirm the decree of the Tax Court. Costs to plaintiff.