IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

PETER A. CONFEHR, )
)
      Plaintiff, ) TC-MD 110621D
)
   v. )
)
MULTNOMAH COUNTY ASSESSOR, )
)
      Defendant. ) **DECISION**

Plaintiff appeals the 2010-11 real market value of property identified as Account

R334821 (subject property). A trial was held in the Oregon Tax Mediation Center, Salem,

Oregon on November 28, 2011. W. Scott Phinney, Attorney at Law, appeared on behalf of

Plaintiff. Sara Herrejon (Herrejon), subject property's manager, and Rick M. Bean (Bean),

Director of Marketing, Prime Property Tax Negotiation and real estate broker, testified on behalf

of Plaintiff. Lindsay Kandra, Assistant County Attorney, Multnomah County, appeared on

behalf of Defendant. Larry A. Steele (Steele),[1] Commercial Appraiser 2, Multnomah County

Division of Assessment, Recording and Taxation, testified on behalf of Defendant.

Plaintiff's Exhibit 1, 1 through 102, and Exhibits 2 and 3 and Defendant's Exhibit A were

received without objection.

## I. STATEMENT OF FACTS

The subject property also known as Arborview Apartments is described by Steele as:

"Six, two story wood frame apartment buildings with a total of 70 units, open
parking lot (91 parking spaces), and a community pool and recreation room. This
development ranks as an average quality constructed project, which was
completed in 1975. The unit mix includes 20 studio 485sf units; 16 one
bedroom/one bathroom 543sf units; 16 small two bedroom/one bathroom 732sf
units; 17 large two bedroom/one bathroom 836sf units; and 1 three bedroom/one

---

[1] The parties stipulated that Steele can be considered an expert witness.

bathroom 1026sf unit.  It is also important to note that the manager's unit (#70) was formerly a three bed unit but one bedroom was converted into an office, therefore, for the purpose of this appraisal it will be considered as a two bedroom unit.  * * * Arborview occupies a site of 2.16 acres/94,090sf."

(Def's Ex A-8.)  Bean testified that the subject property's exterior condition is "average" and the interior condition is "less than average" because the appliances and cabinets in the units are "original," with no upgrades or replacement since the date of construction.  He testified that the recreation room, including pool, and laundry room are located on the "second floor," and he did not see any access for persons who cannot climb stairs, concluding that the recreation room is "non-ADA compliant."  Bean testified that there are no "washers and dryers in the units," stating that it is a "plain Jane" or "class C" apartment complex and not a property that would be of interest to an "institutional-type investor."

Bean testified that the subject property is not located in a "highly apartment centric" area.  He testified that the area "is more commercial," than residential, creating "no sense of neighborhood."  Bean testified that the subject property is located in a "relatively high crime area."  (Ptf's Ex 1 at 7–9.)  He testified that there are "300 to 500 reported crimes per year in the area."

Bean testified that the subject property has "$278,800 in repairs that need to be accomplished."  (Ptf's Ex 1 at 87–95.)  Herrejon testified those repairs have not been completed, but do not "get in the way of renting the units."  Bean testified that if the repairs are not "accomplished," then over the "long term" the "asset would deteriorate."

The parties stipulated that the highest and best use of the subject property as improved is "its existing use as a multi-family apartment complex."  (Def's Ex A at 14.)  The parties agreed that given the age of the subject property and the "difficulty in accurately measuring"

/ / /

depreciation, the cost approach is not an applicable valuation method. (Ptf's Ex 1 at 11; Def's Ex A at 15.)

A.    *Income Approach*

Bean and Steele determined the subject property's real market value as of the date of assessment using the income approach. (Ptf's Ex 1 at 11, 13–31; Def's Ex A at 16, 30–41.) Bean prepared an analysis entitled "CAPITALIZATION OF INCOME INTO VALUE." (Ptf's Ex 1 at 13.) Bean testified that in determining income and expense he relied on the "budget comparison" statements for years 2007, 2008, 2009 and 2010, the "Rent Roll with Lease Charges" dated January 1, 2010, and "Market Survey." (Ptf's Ex 1 at 14–32.) When asked, Bean responded that the "Market Survey" was "not prepared for this case" and acknowledged that some of the comparable properties did not have studio or 3 bedroom units available for rent.

Bean's effective gross income matched the "budget comparison" reports for each year. (*Id*. at 13-14, 17, 20 and 23.) The reported effective gross income included "Market Rent" and "Other Income" reduced by "Loss to Lease," "Vacancy Loss," "Concessions," "Employee Unit," and "Misc." (*Id*. at 13.) Bean defined "loss to lease" as a "landlord trading for long-term guaranteed stream of income" and "concessions" as incentives to "get renters in the door or to retain tenants." He testified that an "employee unit" is "actually an expense because it is a manager's compensation plus some salary." Steele disputed that "loss to lease," "concessions," and "employee unit" are allowable reductions, stating those expenses "are all considered business decisions that have an effect on the property's income but are not considered operating expenses to the property." (Def's Ex A at 40.) Bean testified that other income includes "rubs" (renter's utility billing system), laundry revenue, late fees and application fees. Bean stated that effective gross income ranged from $442,800 to $504,748 over the four years. (Ptf's Ex 1 at 13.)

Steele determined effective gross income after conducting "[a] market survey of apartment complexes similar to the subject * * * within the subject's competing market area." (Def's Ex A at 30.) He concluded that "the subject's asking rents are about in line with the market." (*Id*. at 35.) Steele stated:

> "It is also important to note that the subject's studio units and one bedroom units are an atypical size for the market. Studio units in the subject's market area typically range from <400 square feet to about 450 square feet. The subject's studio units measure about 485 square feet, 8%-21% <u>larger</u> than typical. The converse is true for the one bedroom units. Typical one bed units in the subject's market area range from 590 square feet to 690 square feet. The subject's one bed units are 8%-21% <u>smaller</u> than typical, measuring about 543 square feet. It is for this reason that the subject's indicated market rents for studio units is greater then (*sic*) subject's indicated market rents for one bedroom units."

(*Id*.) (Emphasis in original.) Steele determined an "indicated market rent per unit" in excess of the subject property's actual monthly rent for all types of units except one bedroom/one bathroom units. (Ptf's Ex 1 at 32; Def's Ex A at 35.) Bean testified that "it is important that rent comparables be within a smaller radius as possible" to the subject property. In response to the number of years he considers relevant for a stabilized period, Steele testified that he looks for 10 years. Steele testified that he does not know if any of the rental comparable properties he relied on include "rubs" or "concessions" in the reported revenue. Steele testified that he relied on "actual historical data taken from the 2007, 2008, 2009, and 2010, operating statements to calculate other income * * *." (Def's Ex A at 36.) He concluded that other income should be "seven percent of the potential gross income." (*Id*.) Steele determined a five percent vacancy loss after consulting "[m]ultiple professional publications," showing "typical vacancy rates of 4.0% to 6.9% for Portland and Outer South East Portland apartment properties." (*Id*.) Steele concluded that the subject property's effective gross income was $530,322. (*Id*. at 39.)

Bean testified that he relied on the actual operating expenses stated in the Budget Comparison reports for each year. He increased the operating expenses for property taxes and

added as an expense a "$250 per unit replacement reserve." (Ptf's Ex 1 at 11.) Bean testified that a "$250 per unit replacement reserve, or $17,500 per year" is 'probably low" given the identified "deferred maintenance" for the subject property.

To determine operating expenses, Steele testified that he relied on "[a] comprehensive study of sales and expense information from 2007 and 2008 apartment sales in the Portland Metro Area * * * conducted and published by Mark D. Barry" and an "Integra Realty Resources Marketing Pulse Report for Q1 2010." (Def's Ex A at 37.) Steele testified that based on his research property taxes are 8.2 percent of effective gross income. (*Id*.) He testified that he based his conclusion on a Mark D. Barry article entitled *How Much Does It Really Cost to Operate An Apartment Complex?,*" a "hypothetical average quality 100 unit 1970's built Beaverton area apartment with limited amenities." (*Id*. at 60.) Steele reduced the "range" of operating expense percentages by 8.2 percent, resulting in adjusted ranges of "33% - 42% of EGI [effective gross income] to "27% - 42%," ultimately determining "an expense ratio of 40%[.]" (*Id*. at 37.) Steele testified that the 40 percent operating expense ratio included a "2 and one-half percent reserve for replacements." (*Id*.)

After deducting operating expenses, replacement reserves, and property taxes, Bean determined a net operating income for each year, ranging from $224,563 to $269,031. (Ptf's Ex 1 at 13.) Steele determined a net operating income of $318,193. (Def's Ex A at 39.)

To determine a capitalization rate, Bean testified that his research of capitalization rates was summarized in "Capitalization Rate Data, Multnomah County Apartments-East Portland/Gresham January 1, 2010[.]" (Ptf's Ex 1 at 34.) He testified that the capitalization rates for "sales within the same time frame" ranged from 6.8 percent to 11.8 percent. (*Id*. at 57.) Bean testified that he "chose a capitalization rate of 8.5 percent, a little less than the average of

8.65 percent." He testified that he added "a 1.14 percent property tax rate" to determine an "overall rate" of 9.64 percent. (*Id*. at 13.) Using the overall capitalization rate of 9.64 percent, Bean determined "value" for each year, ranging from $2,329,492 to $2,790,778. (*Id*.) He concluded an "Indicated Value for 2010-11" using "four years of stabilized operating history" of "$2,375,000." (*Id*. at 11, 13.)

Steele testified that in determining a capitalization rate he reviewed the "[s]ales with market capitalization rates gathered from the sales comparison valuation approach[,]" ranging from 6.45 percent to 7.31 percent, and "[p]rofessional publications were also reviewed for supporting data." (Def's Ex A at 38.) In response to questions, Steele testified that he agreed that the subject property is a "Class C property" and he does not know if the "professional publications cap rates" include "Class C properties." Steele was asked why his "computed capitalization rate for comparable #5" was less than the 7.75 percent, as reported by Costar; he responded he relied on a "sales flyer, but did not talk to the parties." Steele stated that "[a]fter analyzing all data, a capitalization rate of 7.0% in considered reasonable for this analysis." (*Id*.) Steele testified that as a "doublecheck," the comparable sales "fell within the publications range." Steele testified that "1.40% is also added to the capitalization rate to account for taxes. The 1.40% is based on a Portland citywide tax comparison done periodically for all apartment properties by Multnomah County." (*Id*.) Using an overall capitalization rate of 8.40 percent, Steele determined an "Estimated Total Value" of $3,780,000 (rounded). (*Id*. at 39.)

B.      *Market Data Analysis and Sales Comparable Approach*

Bean testified that to "verify the validity of the income analysis comparable sales were reviewed." (Ptf's Ex 1 at 12.) Bean described his market data analysis as follows:

"To compare the sales to the subject the net operating incomes were compared. Since this is the key factor to an investor it makes sense to use it as a basis of

analysis. Also the NOI captures all factors that influence items of income and expense. The comparison was made on both a per unit and per square foot basis. A ratio of subject NOI to comparable NOI is determined. That ratio is then applied to the comparable sale price per unit or square foot to obtain an indication of value for the subject. This is in effect equalizing the subject and the comparables on the basis of their earning power. The goal is the same whether the adjustments are made on a specific item basis or are based on an overall unit comparison."

(*Id.*) In support of his "methodology," Bean referenced an article entitled "*Why the Fear of DCF?*" that was published July, 1990, in *The Appraisal Journal*. (*See id*. at 79.) When asked if the percentage relationship between the subject property's net operating income and the comparable property's net operating income suggests a "closer value" if the percentage approaches 100 percent, Bean testified that "it does not."

Bean testified that in selecting comparable sales the "most important factor is that sales are all from the same time frame" because "adjustments can be made for size, location, quality, and amenities but a time adjustment is difficult to determine." In his written report, Bean stated that he selected 11 sales, discarding one because of the "lack of size information," all others are "located in Multnomah County in East Portland and Gresham" and "derived from Costar." (*Id*. at 12, 57.) Bean testified that he inspected a "number of the properties." When asked by Defendant if he knew that one of the properties he selected was the sale of a mobile home park, Bean testified that he "did not inspect that property" and that sale "should be excluded." When asked the location of Springcreek Trail, Bean testified that he "didn't know the location and did not visit the property." Bean stated that the properties range in size "from 12 to 50 units" and "[t]he ages range from 1960 to 1981[,]" concluding that the "comparable sales share location age and other general characteristics with the subject property." (*Id*. at 12.) When questioned about his selected sales, Bean testified that the sale dates ranged from November, 2008 to June, 2010 and he "would have preferred sales closer" to the assessment date, but he had to rely on available

data. Bean was questioned about how he verified the sales data, stating that he "made phone calls" and "looked online," stating that "Stonehedge, Multi-Property sale and Yorktown Gardens" were all confirmed sales. In his report, Bean wrote that:

> "After [the net operating income] adjustment the sales indicated a value range[] of $28,923 to $42,661 per unit and $37.63 to $65.29 per square foot. The indicated value from the market analysis is $2,420,000. The indicated value from the income analysis is $2,375,000. This equates to $33,929 per unit and $51.96 per square foot. These figures are within the range established by the market data."

(*Id*.)

Steele testified that the "sales comparison approach" is based on the substitution principle. He testified that he found "all of his comparable properties through Costar," based on "sale date, year constructed, number of units, unit mix, quality, neighborhood and on-site amenities." Steele testified that he visited each of the five properties he identified as comparable to the subject property. (Def's Ex A at 17.) Steele testified that for two of the five comparable properties he attached sales confirmation letters, responding that one of the confirmation letters stated that "a real estate trade" was involved but he did not know "what type of property it was traded for." (*Id*. at 49.) For each of the five properties, Steele noted qualitative adjustments for quality, location, amenities, age, condition, unit mix and overall adjustments. (*Id*. at 27.) Steele testified that none of the comparable properties had studio units and that comparable properties 1, 3 and 4 had "deferred maintenance as a point of price negotiation at the time of sale." (*Id*.) Steele testified that he did not know the condition of the properties as of the subject property's date of assessment. In response to questions about comparable property #1, Steele testified that he placed "no reliance" of that sale given its size (168 units), number of garages, and lack of a fitness center. He testified that comparable #1 was included because it "helps to bracket" the sales and at the time of sale there was "significant deferred maintenance." Steele acknowledged that comparable sale #3 was "21 years old," had under building garages and located in

Rockwood which according to Plaintiff's Exhibit 2 shows that it is located in a lower crime area than the subject property. He admitted that comparable sale #4 was "never on the market." Based on the unadjusted sale price for the five comparable properties, Steele computed prices per square foot ranging from $52.14 to $73.96 and prices per unit ranging from $48,889 to $65,744. (*Id.*) In his report, Steele stated that the "best comparable is sale five[,]" noting that "[i]t lies in the same neighborhood, is the closest to the subject, and sold within a few weeks of the target appraisal date." (*Id.* at 28.) Steele concluded that $73 per square foot "best reflect[s] the market value for the Subject Property[,]" indicating a real market value of $3,330,000 (rounded). (*Id.*)

In his report, Steele stated that "[b]ecause unit sizes vary significantly among apartment developments, the value/sf method of valuation, generally, more accurately reflects an apartment development's market value, compared to the value/unit method." (*Id.*) (Emphasis omitted.) Steele noted that because the subject property's "studio units and one bedroom units are an atypical size for the market[,] * * * the value/sf method receives secondary weight in this analysis." (*Id.*)

Looking at the "range of value/unit," Steele concluded that "comps two, four, and five indicates $48,889/unit to $53,000/unit" and a "factor of $51,000/unit is considered to best reflect the market value of the Subject Property again due to the high degree of comparability of sales two, four and five." (*Id.*) Steele testified that the subject property's indicated real market value would be $3,570,000. (*Id.* at 29.) After considering both the unit value and square foot value, Steele reconciled to a "final value" of $3,500,000. (*Id.*)

C.    *Reconciliation*

In his report, Bean stated:

"In reaching an overall conclusion of value the income analysis and market analysis were given considerable weight. This is consistent with investment

analysis. The opinion of value is $2,400,000 (rounded) for the subject property as of January 1, 2010.

"From this figure $200,000 must be deducted for deferred maintenance. While the estimate to cure the problem is $278,813.18, some of that cost will come from reserves.

"My final conclusion of value as of January[ ], 2010 is $2,175,000."

(Ptf's Ex 1 at 12.) In response to questions, Bean testified that he is giving "a broker opinion of value, not doing an appraisal." The parties discussed the allowable activities for a licensed broker, referencing ORS 674.100(2)(k) with no consensus whether Bean engaged in "inappropriate activities given his broker license" when he prepared his report and determined a conclusion of value.

In his report, Steele stated in part:

"The Income Approach to value is generally considered to be the most accurate measure to determine the market value of income producing properties.

"The Sales Comparison Approach typically provides a secondary indication of market value, but receives less weight in the final analysis due to the broad range of values that its value/unit and value/square feet factors typically generate."

(Def's Ex A at 42.) Giving "the greatest weight in the reconciliation" to the "Income Approach[,]" Steele concluded that "**the indicated market value for the subject property as of January 1, 2010 is: * * * $3,700,000**[.]" (*Id*. at 43) (emphasis in original.)

## II. ANALYSIS

The issue before the court is the 2010-11 real market value of Plaintiff's property. Real market value is the standard used throughout the ad valorem statutes except for special assessments. *See Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620, at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev*., 13 OTR 343, 345 (1995)). Real

market value is defined in ORS 308.205(1),[2] which reads:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."

There are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property even if one of the approaches is found to not be applicable. *See* ORS 308.205(2) and OAR 150-308.205-(A)(2). Each party determined that the cost approach was not applicable. Both parties considered the income approach. Plaintiff presented a Market Data Analysis and Defendant considered the Sales Comparison Approach.

A.      *Comparable Sales Approach*

The comparable sales approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp v. Lane County Assessor*, TC-MD No 060354D at 6 (Apr 3, 2007), citing Appraisal Institute, *The Appraisal of Real Estate* 335 (12th ed 2001). ORS 308.205(2) provides in pertinent part that "[r]eal market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." The Department of Revenue adopted OAR 150-308.205-(A)(2)(c), stating in part that:

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."

Both Bean and Steele determined the subject property's real market value relying on comparable sales. Both individuals testified that the lack of sales reduced the reliability of this

---

[2] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2009.

approach. Bean testified that he "verified" each of the 11 sales included in his market sales analysis. He submitted limited supporting information, and what information he did submit showed that the information in his summary table did not match the attached property description. (Ptf's Ex 1 at 55.) For example, Bean reported that a property located at 240-244 NE 143rd Avenue sold, but the attached property description stated that it was a partial interest transfer. (Ptf's Ex 1 at 59.) The capitalization rates for two properties stated on the summary did not match the attached property description; no explanation was provided for the difference. (*Id*. at 55, 59–61.) All of the attached property descriptions were for properties with 12 to 17 units except one stating it was 27 units. The largest unit comparable property was 50 units and was the same property that Defendant concluded was most comparable to the subject property. The subject property is 70 units.

Bean testified that all the property characteristic differences except date of sale in relation to assessment date were adjusted through his market sales analysis. He testified that the first step is to determine the percent of the comparable property's net operating income to the subject property's net operating income. (*Id*. at 55.) That percentage is next divided into the comparable property's sale price and then divided by the number of units of the comparable property to determine an "indicated value per unit." (*Id*.) Bean computed an average indicated value per unit of $34,573.97 and multiplied that by the subject property's 70 units to determine an indicated real market value of $2,420,178. (*Id*.) Bean submitted no documents to support the net operating income stated for each of the comparable properties.

Bean supported his methodology by discussing an article entitled *An Analysis of Indicators of Multi-Family Complex Values* published in the *Appraisal Journal* in July, 1990. (*Id*. at 79–86.) In that article, the authors concluded that "the standard of error of estimate for the

four sales comparable approach indicators [square footage of net rentable area; number of rooms; number of bedrooms; and number of units] *is at least twice as large* as the standard error of estimate for any of the income approach indicators [gross rent, gross income, effective gross income and net operating income]. (*Id*. at 84.) (Emphasis in original.) The authors also concluded that the data suggested that "the four indicators commonly used in the income approach are all potentially about twice as accurate as the four 'per unit' measures typically associated with the sales comparison approach." (*Id*. at 85.) Plaintiff offered no statute or administrative rule that authorizes or states that a market data analysis is equivalent to or a substitute for a sales comparable approach.

Steele's comparable sales approach showed similar concerns as Bean's market sales analysis. Steele's selected one property with more than twice the number of units as the subject and sale dates clustered in late 2008 and early 2011 with only one sale occurring close to the January 1, 2010, assessment date. (Def's Ex A at 17.) His verification that each sale was an arm's length sale transaction was not substantiated. Steele testified that he placed the most reliance on the sale occurring in February, 2010, a 50 unit apartment complex with no studio apartments and predominately renting two bedrooms, one bathroom units. (*Id.* at 26.) Steele concluded that the 50 unit property was comparable to the subject property in all categories (quality, location, amenities, age and unit mix) except it was superior to the subject in condition. (*Id*. at 27.) Steele (and Bean) reported the sale price of that property to be $2,650,000. (*Id*. at 17; Ptf's Ex 1 at 55.) The court agrees with Steele that this property is a good indicator of the subject property's real market value as of the date of assessment.

Given the lack of supporting documentation provided by the parties for their comparable sales analysis, the court will give the most weight to the property selected by both parties as a

comparable property and identified by Steele as the most comparable to the subject property.

Steele provided sufficient corroborating information for his conclusion.

B.      *Income Approach*

"Any property that generates income can be valued using the income capitalization approach." *The Appraisal of Real Estate,* 13th ed at 447. "In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value. The principle of anticipation is fundamental to the approach." *Id*. at 445. Anticipation is defined as "the perception that value is created by the expectation of benefits to be derived in the future." *Id*. at 35.

"Direct capitalization is a method used in the income capitalization approach to convert a single year's income expectancy into a value indication." (*Id*. at 499.) "A single year's income" commonly referred to as net operating income is divided by a capitalization rate.

The subject property has been operating as a 70 unit income producing apartment since it was completed in 1975. This court has concluded that "[t]he income approach should be based on enough historical data so that a normalized expected income can be determined with confidence. Most experts believe that three to five years, preferably longer, of income experience are needed to make such an estimate." *Bauman et al v. Dept. of Rev*., 6 OTR 426, 433 (1976) (citations omitted). Plaintiff submitted historical operating statements for years 2007, 2008, 2009 and 2010. Those statements show a stabilized operation.

Looking first at potential gross income, specifically market rent less loss to lease and concessions, for three of the four years the subject property's potential gross income was approximately $484,000.[3] Defendant disputes that the subject property's historical market rent

---

[3] Potential gross income by year, rounded, is $455,785 (2007); $483,310 (2008); $483,864 (2009), and $484,390 (2010). (Ptf's Ex 1 at 13, 14, 17, 20 and 23.)

should be given greater consideration than a rent survey of comparable properties. Given the strong year to year comparability of the subject property's potential gross income, the court does not agree with Defendant. The subject property's gross potential income results in a low vacancy rate. Defendant provided no evidence that an increase in rents would net the same low vacancy rate. In addition, Defendant submitted no evidence that renters would pay more for a studio apartment than a one bedroom, one bathroom unit even if the gross living square footage of the studio apartment exceeded that of other studio apartments offered for rent. The court concludes that the consistent year-to-year rents are evidence of stabilized revenue.

Defendant disputes that market rent should be adjusted for loss to lease and concessions. Potential gross income is defined as "rent for all space in the property" and is reduced for vacancy and collection loss. *Appraisal of Real Estate* 13th ed at 483, 484. Collection loss is "caused by concessions or default by tenants[.]" *Id* at 484. Plaintiff reported two reductions to market rent. First, the loss to lease described as a cost to keep or retain an existing renter. Second, concessions described as a cost to attract new renters. Both costs, concessions and loss to lease, are acceptable operating costs and reductions to market rent. In determining net operating income, the court concludes that the subject property's potential gross income is $484,000.

Another reduction to potential gross income is vacancy. Vacancy is usually estimated as a percentage of potential gross income. (*Id*. at 484.) According to the subject property's operating statements, vacancy for three of the four years ranged from 3.3 percent to 5.4 percent. (Ptf's Ex 1 at 13.) In 2009, the vacancy percentage jumped to 10.4 percent. Steele determined "an annualized vacancy rate of 5.0%[.]" (Def's Ex A at 36.) Given the evidence, the court concludes that an acceptable vacancy rate is 5 percent.

In addition to potential gross income, the subject property received other income listed on the Budget Comparison reports as application fees, non-compliance fees, late fees/return check fees, laundry income, forfeits/damages, utility charges and miscellaneous. (Ptf's Ex 1 at 13, 14, 17, 20 and 23.) For the four years, other income ranged from $22,236 to $48,984. (*Id*. at 13.) During 2009 and 2010, the subject property's other income more than doubled from that reported in 2007. Defendant reviewed the subject property's four years of reported other income, concluding that seven percent of the potential gross income "falls in line with data reported by various professional publications." (Def's Ex A at 36.) Given the evidence, the court concludes that the subject property's other income is 8 percent of potential gross income.

After deducting the 5 percent vacancy from potential gross income and adding other income, the subject property's effective gross income is $498,520.

The next step in determining net operating income is to determine operating expenses. Looking again to the subject property's historical operating statements, operating expenses, including the cost of the apartment unit housing for the on-site manager and excluding property taxes, ranged from 43 percent to 52 percent with two years averaging 48 percent. (Ptf's Ex 1 at 13.) Defendant determined that "an expense ratio of 40%, without taxes" and including a 2.5 percent "reserves for replacement." (Def's Ex A at 37.) The court concludes that Defendant's operating expense ratio is too low. The court concludes that an operating ratio of 48 percent is supported by the evidence.

The parties agree that a reserve for replacements should be included in the operating expenses. Plaintiff's testimony suggested a flat fee per unit that is equivalent to 3.8 percent of effective gross income. (Ptf's Ex 1 at 13.) Defendant determined that a 2.5 percent reserve for replacement was appropriate. (Def's Ex A at 37.) Neither party provided the court with support

for their conclusions. Given the subject property's acknowledged deferred maintenance, the court concludes that a reserve for replacement of 3.5 percent of effective gross income is reasonable.

Having determined an effective gross income of $459,800 and an operating expense rate of 51.5 percent of effective gross income including a reserve for replacements, the subject property's net operating income is $242,000. (rounded.)

The final step in the capitalization of net operating income is to determine the capitalization rate. Plaintiff's determined a capitalization rate of 8.5 percent. (Ptf's Ex 1 at 13.) Bean relied on 11 reported, but unconfirmed, sales occurring in late 2008 to mid-2010 with reported capitalization rates ranging from 7.71 percent to 11.80 percent, stating "Average * * * 8.65%." (*Id.* at 57.) Bean summarized "Capitalization Rate Data" for "Multnomah County Apartments – East Portland/Gresham" for various class properties in Oregon counties and "National" for various time periods. (*Id*. at 34.) Bean testified that he placed significant reliance on "Marcus and Millichap, Class C, Portland Metro" area first quarter 2010 report, reporting capitalization rate of "[l]ow 8+." (*Id*.) Defendant determined a capitalization rate of 7 percent. (Def's Ex A at 39.) Steele testified that he relied on "[s]ales with market capitalization rates gathered from the sales comparison approach[,]" and "Professional Publications were also reviewed for supporting data." (*Id.* at 38.) Steele's capitalization rates for "sales comparables" ranged from 6.45 percent to 7.31 percent. (*Id*.) As previously discussed in the sales comparison approach section, the court finds that the sale dates of Steele's comparable properties crate too wide a bracket with reference to the assessment date and the properties are significantly different from the subject property in unit size and mix. Steele's capitalization rates found in "[p]rofessional publications" ranged from 6.75 percent to 7.78 percent. (*Id*.) Steele testified that

even though he agreed the subject property is a "Class C" property, he did not know the class of the properties in the professional publications. The court finds Steele's reliance on professional publications without knowing more about the data reported to be unpersuasive.

Both appraisers allowed an expense deduction for reserve for replacement in arriving at net operating income. (Ptf's Ex 1 at 13; Def's A at 37.) This court has previously raised a concern that "it is an error for" an "appraiser to develop a cap[italization] rate based on comparables that do not subtract reserves for replacement when reaching NOI and to then apply that cap rate to a NOI for the subject that has * * * reserves subtracted." *Allen v. Dept. of Rev.*, 17 OTR 248, 262 (2003). Neither appraiser submitted evidence addressing whether the comparable properties did or did not deduct reserves for replacement.

Given the testimony and evidence, the court concludes that a capitalization rate of 8 percent is reasonable. A property tax rate must be added the capitalization rate. The parties agree that Defendant's property tax rate of 1.4 percent is correct. (Def's Ex A at 38.) The overall capitalization rate is 9.4 percent.

Applying the 9.4 percent capitalization rate to the net operating income of $242,000, the subject property determined real market value is $2,600,000 (rounded.)

Plaintiff requests that the court reduce the subject property's real market value for estimated deferred maintenance in the amount of $200,000. Plaintiff's on-site manager testified that the building items requiring maintenance do not interfere with her ability to rent units and there was no testimony when Plaintiff will contract to repair the identified items. In determining net operating income, a reserve for replacement was allowed as an operating expense. Given the testimony and evidence, the court concludes that the reserve for replacement is adequate and

/ / /

there is no need to make an additional adjustment for Plaintiff's estimate of deferred

maintenance that does not impair his ability to rent all available units.

### III. CONCLUSION

After careful consideration of the testimony and evidence, the court concludes that the

income approach should be given the most consideration in determining the subject property's

real market value. Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2010-11 real market value of property

identified as Account R334821 is $2,600,000.

Dated this ____ day of February 2012.

JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Presiding Magistrate Jill A. Tanner on February 27, 2012. The Court filed and entered this document on February 27, 2012.*