IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

ANDREWS FOOTHILLS LLC,                    )
                                          )
        Plaintiff,              )    TC-MD 110619N
                                          )
    v.                                )
                                          )
MULTNOMAH COUNTY ASSESSOR,                )
                                          )
        Defendant.              )    **DECISION**

Plaintiff appeals the real market value of property identified as Account R121692

(subject property) for the 2010-11 tax year. Trial was held in this matter on December 14, 2011,

in the Tax Courtroom, Salem, Oregon. W. Scott Phinney, Attorney at Law, appeared on behalf

of Plaintiff. Tiffanie Snelson (Snelson), "community manager" for the subject property, and

Rick Bean (Bean), real estate broker, testified on behalf of Plaintiff. Lindsay Kandra, Assistant

County Counsel, appeared on behalf of Defendant. Larry Steele (Steele), Commercial Property

Appraiser, testified on behalf of Defendant.

Plaintiff's Exhibit 1 and rebuttal Exhibits 2, 3, and 6 were offered and received without

objection. Plaintiff offered Exhibit 4, demographic information about the subject property and

Defendant's comparable sales, as a rebuttal exhibit. Defendant objected to Plaintiff's Exhibit 4

on the basis that it does not rebut any of Defendant's evidence. The court excluded Plaintiff's

Exhibit 4 because neither party presented evidence on demographics and Exhibit 4 has no

rebuttal purpose. Plaintiff offered Exhibit 5, an application of Plaintiff's "market data analysis"

methodology utilizing adjustments based on net operating income (NOI) to Defendant's

comparable sales, as a rebuttal exhibit. Defendant objected on the basis that Defendant did not

/ / /

use Plaintiff's "market data analysis" methodology. The court allowed Plaintiff's Exhibit 5 as a rebuttal exhibit. Defendant's Exhibit A was offered and received without objection.

## I.  STATEMENT OF FACTS

The subject property is the Foothills Apartments located in the Centennial Neighborhood in Portland, Oregon. (*See* Ptf's Ex 1 at 1-2; Def's Ex A at 9.) The subject property is situated on 4.22 acres with a 58,836 square feet apartment complex constructed in 1990. (Ptf's Ex 1 at 1.) Snelson testified that the subject property is comprised of 15 buildings with four apartments per building. She testified that the subject property also includes 15 garages, 13 of which are rentable. Bean testified that the subject property buildings are two-story, wood-frame structures with aluminum windows and original countertops. Snelson testified that the subject property includes 59 two bedroom, two bathroom units, each of which is 985 square feet, and 1 one bedroom, one bathroom unit that is 771 square feet and attached to the manager's office. (*Id.* at 4.) Snelson testified that each unit includes a washer and dryer, a dishwasher, and a garbage disposal. She testified that the subject property amenities include a spa and a swimming pool that is open from Memorial Day to Labor Day. Bean testified that the subject property does not include a clubhouse or gym. He testified that the subject property is very "low density" as a result of its zoning; it probably could not be rebuilt "under current economics." (*See id.* at 14-16.) Bean testified that the subject property density is about 14 units per acre, whereas new construction is typically 25 units per acre.

Snelson testified that she has been the "community manager" for the subject property since March 2011, but has previous experience with property management for low-income housing. She testified that she is responsible for the maintenance and cleanliness of the subject property, as well as for keeping units rented. Snelson testified that the subject property has

aluminum frame, single pane windows that result in ongoing mold and mildew problems. She testified that the subject property parking lot needs to be repaved. Snelson testified that she has been replacing or repairing appliances in the subject property units every month or two. On cross examination, Snelson testified that she did not work at the subject property on January 1, 2010, and conceded that should could not testify as to its condition as of that date. Bean testified that the aluminum windows will need to be replaced soon. He testified that there are higher maintenance costs associated with the subject property because it is 15 four-plexes that each have a roof and stairs, rather than one building.

Snelson testified that she lives on-site at the subject property which is typical for an apartment of its size and allows her to "keep an eye" on the tenants. Snelson testified that the subject property's previous manager, from mid-2009 to March 2011, did not live on-site. She testified that she does not pay rent for her unit; it is included as part of her salary. Snelson testified that there is a lot of "foot traffic" near the subject property and sometimes passers-by will attempt to access the subject property's pool. Snelson testified that the subject property is located on 174th Avenue on the corner of Powell Boulevard. She testified that there are entrances to the subject property from both Powell and 174th Avenue and, as a result, drivers sometimes use the subject property parking lot as a thoroughfare. Snelson testified that there is a gate on the Powell entrance but the fire marshal will not allow Plaintiff to close it.

Snelson testified that several retail and commercial properties are located within one quarter mile of the subject property, including a Safeway, a Bi-Mart, and a 7-Eleven. She testified that movie theaters and restaurants are also within walking distance of the subject property. Snelson testified that the subject property is located on public transit routes and that elementary, middle, and high schools are all located within a few blocks of the subject property.

Snelson testified that the subject property location is "not the greatest neighborhood," but it is "not the worst, either." She testified that problems include loitering and graffiti. Snelson testified that Princeton Property Management employs a security guard for night patrol of the subject property and a "maintenance guy" who cleans the graffiti. She testified that potential tenants often ask about crime. Bean testified that the subject property is in a "high crime" area and provided Portland maps "CrimeMapper" maps showing crimes in the 12 months preceding "10/31/2011" that occurred within a one-half mile radius of the subject property. (Ptf's Ex 1 at 11-13.) He conceded on cross examination that the crime data provided does not pertain to January 1, 2010.

Snelson testified that she does not prepare the subject property budget and rent rolls, but she collects data and sends it to Princeton Property Management. Snelson testified that rents and lease renewals are determined by a team of which she is a member; the team determines rents in part based on market surveys. She testified that the subject property rents are slightly lower than others in the area because tenants pay their own water, sewer, and garbage. Snelson testified that, as of the date of trial, the subject property was 100 percent occupied and was not suffering from significant problems with vacancy. She testified that the highest vacancy, in her experience, was 10 percent. Snelson testified that, in addition to rent, Plaintiff receives from tenants pet deposits and "pet rent" of $25 per month for one pet and $35 per month for two pets.

The parties agreed that the cost approach has no relevance to the subject property value as of January 1, 2010. Bean testified that he completed a "broker opinion of value" (BPO) in which he determined the value of the subject property using the income approach and a "market data analysis" of 11 comparable sales. (Ptf's Ex 1 at 14-18.) Bean testified that he prepares BPOs based on appraisal theory as he understands it. He testified that an appraisal is often

"MAI-prepared" and that he does not have an MAI designation; however, he does not think that the content of his BPOs differ much from an appraisal. Bean testified that he visited the subject property the day before trial and also "one or two other times" prior to preparing his report. Steele testified that he inspected the subject property and completed an appraisal. He testified that he has inspected each property that he used as a comparable sale or rent comparable.

A.    *Market conditions*

Bean testified that the market "crash" occurred in September 2008, and, after the crash, "the market all but dried up. Prices dropped, capitalization rates increased and the volume of sales dropped." (Ptf's Ex 1 at 15.) Bean referred to several articles and market surveys in support of his description of "post-crash" market conditions, including Norris & Stevens and the Winter 2010 Barry Apartment Report. (*Id.* at 46, 52-54.) He noted that, according to "Cliff Hockley, President of Bluestone & Hockley Real Estate Services," as reported in the Winter 2010 Barry Apartment Report, "[a]partment owners will need to brave a downturn for the next 24 months to get to the light at the end of the tunnel in 2012." (*Id.* at 54.)

B.    *Income approach*

Bean testified that he utilized the subject property actual income and expenses in his income analysis, stating potential gross income ranging from $514,038 in 2007 to $538,080 in both 2009 and 2010. (Ptf's Ex 1 at 19.) Bean testified that Princeton Property Management provided him with rent comparables for a different property, Arbor View, from April 2010. (*Id.* at 38-39.) He testified that he has visited Arbor View and that he considered the rent comparables as a "check" on the subject property actual rents. Bean testified that he also used Plaintiff's actual figures for vacancy loss, loss to lease, concessions, "[m]isc. [i]ncome," and "[o]ther [i]ncome," which includes reimbursements for utility expenses from tenants. (*Id.* at 19.)

As a percentage of potential gross income, the subject property "vacancy loss" was 1.77 percent in 2007; 2.01 percent in 2008; 5.19 percent in 2009; and 4.16 percent in 2010. (*Id.*) Bean testified that "loss to lease" reflects the per unit discount associated with "long-term leases" of 12 months or more. "Loss to lease" ranged from $10,101 in 2008, to $22,804 in 2007. (*Id.*) Bean testified that "concessions" reflect the deals given to tenants to sign a lease, including "move-in specials." "Concessions" ranged from $90 in 2007 to $1,129 in 2010. Bean calculated effective gross income for the subject property of $527,889 in 2007; $543,974 in 2008; $542,665 in 2009; and $545,917 in 2010. (*Id.*)

Bean testified that he also relied on the subject property's actual operating expenses which were $240,102 in 2007; $257,243 in 2008; $277,235 in 2009, and $253,593 in 2010. (Ptf's Ex 1 at 19.) He testified that the subject property budget comparisons did not include property taxes. (*See id.* at 19-32.) The subject property's operating expenses ranged from $4,327 per unit in 2007 to $4,946 per unit in 2009, and from $4.08 per square foot in 2007 to $4.71 per square foot in 2009. (*Id.* at 19.) As a percentage of effective gross income, the subject property's operating expenses ranged from 45.48 percent in 2007 to 51.09 percent in 2009. (*Id.*) Bean testified that the subject property expenses are on the higher end of the range on a per unit basis, but are within the range of expenses reported by the Metro Multifamily Housing Association report. (*See id.* at 56 ("Overall expenses per unit range from $3,221 for older garden style units in Clark County, up to $4,175 for older garden style in Washington County. Costs per sq. ft. range from $3.42 for newer garden style in Clark County, up to $7.71 for newer urban style projects in Multnomah County").) Bean testified that the subject property budget includes no provision for replacement reserves, so he used replacement reserves of $250 per unit, for a

total of $15,000.[1] Based on Bean's correction to his replacement reserves, Bean's net operating income (NOI) ranged from $250,430 in 2009 to $277,324 in 2010.[2] (*Id.*) He testified that the subject property's NOI is "stabilized."

Bean testified that, to determine an appropriate capitalization rate, he considered both actual sales from East Portland/Gresham and market surveys from Marcus and Millichap, Norris and Stevens, Realty Rates, Real Capital Analytics, the Barry Apartment Report, and Metro Multifamily Housing. (*See* Ptf's Ex 1 at 40 (noting in bold font the reports that Bean considered most applicable to the subject property).) He testified that the subject property is a "Class C" "garden style" property and that Marcus and Millichap is the only report that breaks out properties by class; the other reports focus primarily on class A and B properties. Bean testified that "Class A" properties are closer to the central business district and often include concierge services. He testified that "Class B" properties are usually a little older. According to Bean, Marcus and Millichap reported capitalization rates in the "Low 8+" for "Class C" properties in the "Portland Metro" area for "1Q 2010." (*Id.*; *see also id.* at 44 ("Class C cap rates will rise modestly from the low-8 percent range this year, while initial yields for mid-tier properties will remain in the mid-7 percent range.").) Capitalization rates from the market surveys that Bean identified as most relevant range from 6.2 to 11.8 percent. (*Id.* at 40.) The capitalization rates of the 11 sales that Bean identified as comparable ranged from 7.71 to 11.80 percent with an average of 8.56 percent; the sales occurred between November 2008 and June 2010 in the East

/ / /

/ / /

---

[1] Bean testified on cross examination that the statement in his report that replacement reserves were $19,500 is a typographical error; the correct figure is $15,000. (*Cf.* Ptf's Ex 1 at 19.)

[2] Not including the expense for "employee unit," the subject property's NOI is $286,481 in 2007; $303,823 in 2008; $302,964 in 2009, and $288,746 in 2010. (Ptf's Ex 1 at 15.)

Portland/Gresham area.[3] (*Id.* at 40, 60-61.) Bean selected a capitalization rate of 8.50 percent, to which he added a property tax rate of 1.55 percent for an overall rate of 10.05 percent, from which he concluded a 2010-11 real market value of $2,740,000 rounded.[4] (*See id.* at 19.)

Steele identified six rent comparables, three of which included water, sewer, and garbage in the rent. (Def's Ex A at 26-31.) Plaintiff questioned why Steele did not make adjustments based on whether rent includes water, sewer, and garbage. Steele testified in response that he did not think that was necessary. Steele determined that the market rents "indicate that the [subject property's] asking rents are typical of the current market rates." (*Id.* at 32.) The subject property's actual rents as of January 1, 2010, were $750 per month for the two bedroom, two bathroom units, and $650 per month for the one bedroom, one bathroom unit. (*Id.*) Steele concluded indicated rent of $738 per month for the two bedroom, two bathroom units, and $616 per month for the one bedroom, one bathroom unit, for potential gross income of $529,896. (*Id.* at 32, 36.) Steele relied on the subject property actual "other income" and concluded other income of $42,391, or 8.0 percent of potential gross income. (*Id.* at 32-33, 36.) Steele considered several market surveys from the fourth quarter 2009 and the first quarter 2010 that reported vacancy ranging from 4.0 to 6.90 percent; he selected a vacancy rate of 5.0 percent. (*Id.* at 33, 36.) Steele calculated effective gross income of $545,793. (*Id.* at 36.)

Steele testified that, to determine expenses, he considered a report analyzing "sales and expense information from 2007 and 2008 apartment sales in the Portland Metro Area [that] was conducted and published by Mark D. Barry[]." (Def's Ex A at 34.)

---

[3] Defendant questioned Bean at length concerning the source of each capitalization rate that he reported and other information regarding each sale on which Bean relied. *See infra* "*Market data analysis*."

[4] Based on Plaintiff's 2010 data, Bean's selected overall capitalization rate yields an RMV of $2,759,443. (*See* Ptf's Ex 1 at 19.) Bean had originally determined an indicated value of $2,700,000 (rounded). (*Id.*) The RMV reported above is from Bean's testimony that, based on his correction to the replacement reserve calculation, the indicated value should be increased by approximately $40,000.

> "The results of that study indicate that the average expense rate for Newer Garden Style Apartments (1990-2007) showed a range of 40%-47% of Effective Gross Income. This percentage included property taxes which must be backed out of those figures, as that expense is factored into the 'loaded' cap rate which includes an effective tax rate (ETR) component. The subject property's actual property taxes for 2009 make up 12.1% of effective gross income. * * * This percentage must be deducted from the operating expenses. This provides a range of operating expenses of about 28% - 35% of EGI."

(*Id.*) Steele also considered the "Integra Realty Resources Market Pulse Report for Q1 2010" indicating expenses ranging from 36.5 to 50 percent, or 24 to 38 percent after property taxes are removed. (*Id.*) Plaintiff noted that Integra reports focus primarily on class A and B properties. Bean concluded an expense ratio of 35 percent, excluding property taxes and including 2.5 percent for reserves for replacement, for NOI of 354,766. (*Id.* at 34, 36.) Plaintiff questioned why Steele did not consider expenses for the rent comparables on which he relied to determine income. Steele testified in response that he did not have sufficient data; Defendant does not compile expense data.

Steele testified that he considered actual sales from his sales comparison approach as well as market surveys to determine a capitalization rate for the subject property. (*See* Def's Ex A at 35.) He reported capitalization rates for his comparable sales ranging from 6.25 to 7.31 percent and market surveys from 2009 and 2010 with capitalization rates ranging from 6.00 to 7.78 percent. (*Id.*) Steele selected a capitalization rate of 7.0 percent, to which he added a property tax rate of 1.55 percent, for an overall rate of 8.55 percent. (*Id.* at 35-36.) In selecting a capitalization rate, Steele emphasized "the high degree of comparability of sale comparable #1 [with a capitalization rate of 7.00 percent] and the general consistency in the comparable sales capitalization rates." (*Id.* at 35.) Steele determined a real market value of $4,150,000 (rounded) under the income approach. (*Id.* at 36.)

/ / /

C.    *"Market data analysis"*

Bean completed a "market data analysis" based on sales of comparable properties.  (Ptf's Ex 1 at 17-18, 59-61.)  He described his methodology as follows:

> "To compare the sales to the subject [property] the [NOIs] were compared.  Since this is the key factor to an investor it makes sense to use it as a basis of analysis.  Also the NOI captures all factors that influence items of income and expense.  The comparison was made on both a per unit and per square foot basis. A ratio of subject NOI to comparable NOI is determined.  That ratio is then applied to the comparable sale price per unit or square foot to obtain an indication of value for the subject.  This is in effect equalizing the subject and the comparables on the basis of their earning power.  The goal is the same whether the adjustments are made on a specific item basis or are based on an overall unit of comparison."

(*Id.* at 18.)  Bean testified that NOI reflects differences including location, amenities, rent concessions, and any other differences with the exception of market conditions at the time of sale; NOI serves as a better "equalizer" than adjustments because it is "objective."  Bean testified that he accounted for potential differences in market conditions by selecting sales from the same time and market conditions as January 1, 2010.

As support of his approach, Bean provided a July 1990 article from The Appraisal Journal, *An Analysis of Indicators of Multi-Family Complex Values*.  (Ptf's Ex 1 at 83-90.)  Bean testified on cross examination that he is not an appraiser or an expert in statistics and that he cannot explain how the approach described in the Appraisal Journal article works.  Defendant noted, and Bean agreed, that the Appraisal Journal article is based on data collected in Atlanta in the mid-1980's.  Bean testified that, although there is no correlation between the subject property with the time or location of the study, the principles from the study are unaffected.

/ / /

/ / /

/ / /

Bean identified 11 apartment sales for his "market data analysis," ranging from 12 to 50 units and from 7,707 to 38,000 square feet.[5] (Ptf's Ex 1 at 59-60.) Bean testified on cross examination that properties built between 1960 and 1981 would, generally speaking, have higher operating expenses than a property built in 1990, such as the subject property. Bean testified that he does not know whether the NOIs reported for his comparable sales were calculated in the same manner as the subject property. Defendant noted that, according to Norris & Stevens, "CAP rates reported by CoStar may not represent actual operation of the property, since the assumptions made by the information source to calculate CAP rate may differ from the actual operating data." (Ptf's Ex 1 at 66.) Bean testified on redirect that the statement from Norris & Stevens is a "cover your behind" statement; it does not mean that all CoStar capitalization rates are not the actual rates.

Bean testified that he did not visit the "Springcreek Trail" property; he reported a capitalization of 8.50 percent. (*See* Ptf's Ex 1 at 60-61.) Bean testified that did not visit the "10746 NE Wygant Street" property. (*See id.* at 59-61.) He testified that the "Wygant" capitalization rate of 7.78 percent was the actual rate. (*See id.* at 59-61, 65.) Bean testified that the capitalization rate of 8.29 percent reported for "15627 SE Stark Street" was from CoStar and he believed that it was the actual rate. (*See id.* at 59-61.) Bean testified that he did not visit the "240-244 NE 143rd Avenue" property and he does not know if the capitalization rate of 10.03 percent was projected or actual. (*See id.*) He testified on redirect that the "NE 143rd Avenue" sale was a partial interest sale. Bean testified that he confirmed the "19511 NE Halsey Street"

///

---

[5] Bean included a longer list of "Multnomah County Apartment Sales" for the "2010-11 Tax Year" in the range of "10-90 Units" in "East Portland." (Ptf's Ex 1 at 61.) However, Bean did not provide capitalization rates for all of those sales and did not include all of those sales in his "market data analysis." (*See id.* at 59-61.)

sale with the owner and the capitalization rate of 8.68 percent is the actual rate. (*See id.* at 59-61, 63.) Bean testified that, based on his conversation with the owner, the capitalization rate of 7.71 percent reported for the "340 NE Cleveland Avenue" sale was the actual rate. (*See id.* at 59-61.) Bean testified that the capitalization rate of 8.70 percent for "1217 NE 122nd Avenue" was from Norris & Stevens and he does not know whether the rate was actual or projected. (*See id*.) Bean testified that he visited the property located at "6729-6731 SE Powell Blvd.," which is a 14-unit property with a capitalization rate reported as 7.74 percent. (*See id.*) He conceded that a 14-unit property is not an ideal comparable for the subject property. Bean testified that he visited the property located at "16000 SE Alder Street," but did not confirm the unit mix and does not know whether the capitalization rate of 6.80 percent is actual or projected.[6] (*See id.*) Bean testified that he did not visit the property located at "10900-11006 NE Broadway Street" and does not know the unit mix for that property. (*See id.*) He testified that the actual "Broadway" capitalization rate was 9.09 percent, not 8.09 percent. (*Cf. id.* at 59-61, 63.) He testified that the property located at "12702 E. Burnside Street" is in the Centennial neighborhood and he does not know whether the capitalization rate of 11.80 percent was projected or actual. (*See id.* at 59-61.)

Bean testified that he analyzed each sale based on NOI per unit and NOI per square foot and determined an indicated value per unit and an indicated value per square foot. (Ptf's Ex 1 at 59-60.) He testified that he used reported NOIs for his comparable sales and subtracted $65,000 for property taxes from the subject property NOI in order to compare it to the NOIs of comparable sales, which include property taxes. For the subject property Bean used an NOI per

/ / /

---

[6] Steele reported a capitalization rate of 6.75 percent for Alder Village. (Def's Ex A at 23.) Plaintiff provided as a rebuttal exhibit a LoopNet listing for Alder Village that was "Last Verified 3/16/2010" stating a capitalization rate of 7.90 percent. (Ptf's Ex 6.)

unit of $3,309 and an NOI per square foot of $3.37.[7]  (*Id.* at 59-60.)  The NOI per unit of Bean's

comparable sales ranged from $3,604 for "16000 SE Alder Street," a 50-unit property, to $5,787

for "240-244 NE 143rd Avenue," a 13-unit property.  (*Id.* at 60.)  The NOI per square foot of

Bean's comparable sales ranged from $4.15 per square foot for "1217 NE 122nd Avenue," a

33,998 square foot property, to $7.49 per square foot for "10746 NE Wygant Street," a 7,707

square foot property.  (*Id.* at 59.)  The court inquired why the subject property NOI is

considerably less than all of Bean's comparable sales; Bean could not provide a clear answer, but

speculated that it was due to the subject property's higher expenses.  Bean's average indicated

value per unit is $39,436.50 and his average indicated value per square foot is $40.22.  (*Id.* at 59-

60.)  Defendant questioned Bean on cross examination as to why he used averages rather than

some other statistic, such as medians.  Bean testified that the mean is a good way to reconcile

data.  Defendant questioned whether Bean's use of comparable sales, all of which are smaller

than the subject property, would skew the data.  Bean conceded that the data set was not ideal.

Bean determined indicated values of $2,368,108 and $2,366,190 under his "market data

analysis."  (Ptf's Ex 1 at 59-60.)  He testified that he gave the most weight to the income

approach and determined a reconciled real market value of $2,600,000 for the subject property.

(*Id*. at 18.)

D.     *Sales comparison approach*

Steele testified that he sought to "bracket" the subject property with both larger and

smaller comparable sales.  He considered factors including the sale date, year of construction,

condition, quality, unit mix, and location, and identified five comparable sales for the subject

---

[7] Bean testified that the NOI per unit that he used in his "market data analysis" is less than the NOI that he determined under his income approach because the actual NOI reported by Plaintiff includes property taxes as an expense and does not include replacement reserves.  (*See* Ptf's Ex 1 at 19, 59-60.)

property. (*See* Def's Ex A at 16, 24.) Steele's comparable sales ranged in size from 43 to 168 units. (*Id.* at 16.) His comparable sales occurred between December 2008 and June 2011, with unadjusted prices per unit ranging from $48,889 to $86,111, and unadjusted prices per square foot ranging from $52.14 to $87.84 per square foot. (*Id.*)

Steele testified that sale 1, Meadowland, has 168 units and is significantly larger than the subject property, but it has the same "blueprint" as the subject property because it is arranged in four-plexes. (*See* Def's Ex A at 16, 18-19.) He testified that sale 1 is one year newer than the subject property and located about 0.2 miles south of the subject property. (*See id.*) Steele testified that sale 1 was a "1031 exchange [on] the seller's side" but, according to Lauren Noecker, the buyer's representative, that was of "no effect to the buyer." (*See id.* at 18.) Steele testified that his sale 2, Stone Creek, is a 90-unit property that is 17 years older than the subject property and he included it primarily for "bracketing." (*See id.* at 16, 19-20.) He testified that sale 4, Alder Village, is a 50-unit property built in 1971 that sold very close to the January 1, 2010, assessment date. (*See id.* at 16, 22-23.) Steele testified that sale 5, Powell Court, is a 72-unit property built in 1998 that is located about 0.2 miles from the subject property. (*See id.* at 16, 23.) Steele made "overall [qualitative] adjustments" (superior, inferior, or comparable) and found sales 1 ("comparable") and 5 ("superior") to be the "most comparable" to the subject property, with sale 1 serving as the "best comparable." (*Id.* at 24.) He determined a value of $70 per square foot, indicating a value of $4,140,000, rounded, and $70,000 per unit, indicating a value of $4,200,000, rounded, and concluded a real market value of $4,140,000, rounded. (*Id.* at 25.)

Plaintiff questioned Steele whether density could affect value and provided a rebuttal exhibit identifying the density in units per acre for the subject property and each of Steele's

comparable sales. (Ptf's Ex 2.) The subject property density is 14.22 units per acre, whereas Steele's comparable sales range from 21.13 units per acre for sale 1, Meadowland, to 39.45 units per acre for sale 3, Burnside Gardens. (*Id.*) Steele testified that he did not consider density as a basis for comparison or adjustment, but conceded that it could affect value. Plaintiff questioned whether Steele had any evidence suggesting that the number of units is important to value; Steele responded that he did not. Plaintiff questioned Steele's conclusions regarding the "condition" and "quality" of each of his comparable sales as compared with the subject property.[8] Steele testified that sale 2, Stone Creek, is inferior to the subject property with respect to condition because it is 17 years older than the subject property and has not been updated. He testified that sale 2 is inferior in quality based on the time of construction and the types of materials used. Steele testified that sale 5, Powell Court, in superior in quality to the subject property because it has better insulation and higher quality windows. Plaintiff questioned why "age," "condition," and "quality" were separate adjustments given that Steele's analysis of each factor overlapped. Steele could not provide a response to that question.

In his reconciliation, Steele placed the most weight on the income approach and secondary weight on the sales comparison approach. (Def's Ex A at 37-38.) He concluded a 2010-11 real market value of $4,150,000 for the subject property. (*Id.*)

The 2010-11 roll real market value of the subject property is $4,433,560. (Ptf's Compl at 2.) The 2010-11 maximum assessed value of the subject property is $3,202,220. (*Id.*) Plaintiff requests a 2010-11 real market value of $2,600,000. (Ptf's Ex 1 at 1.) Defendant requests that the 2010-11 roll real market value be sustained. (Def's Ans at 1.)

/ / /

---

[8] Plaintiff noted, for instance, that all of Steele's comparable sales except for sale 5, Powell Court, are "inferior" in "condition" to the subject property. (Def's Ex A at 24.)

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2010-11 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[9]

The assessment date for the 2010-11 tax year was January 1, 2010. ORS 308.007; ORS 308.210.

"Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). There are three methods of valuation that must be considered, although all three may not be applicable in every case: (1) the cost approach, (2) the sales comparison approach, and (3) the income approach. OAR 150-308.205-(A)(2)(a); *see also Allen v. Dept of Rev.* (*Allen*), 17 OTR 248, 252 (2003). Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

---

[9] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2009.

The parties agree that the income approach should be given the most weight. Defendant also determined values under the sales comparison approach and gave that approach secondary weight. Plaintiff provided a "market data analysis," relying on comparable sales, and gave that approach some weight. The court finds that the income approach should be given the most weight in this analysis.

A.      *Income approach*

"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." *Allen*, 17 OTR at 253 (citations omitted). "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income[.]" *Id.* at 253. "NOI is the currently expected net income of a property after all operating expenses are deducted from gross income. To calculate the NOI, appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data." *Allen*, 17 OTR at 254 (citing Appraisal Institute, *The Appraisal of Real Estate* 484 (12th ed 2001)).

"[T]he income approach should be based on enough historical data so that a normalized expected income can be determined with confidence. Most experts believe that three to five years, preferably longer, of income experience are needed to make such an estimate." *Confehr v. Multnomah County Assessor* (*Confehr*), TC-MD No 110621D at 14 (Feb 27, 2012) (citing *Bauman et al v. Dept. of Rev.*, 6 OTR 426, 433 (1976) (citations omitted)); *see also Valley River Ctr. Et Al v. Dept. of Rev.*, 6 OTR 386, 372 (1976). Plaintiff provided income and expense data for the subject property from 2007 through 2010. Both Bean and Steele agree that the subject property's asking rents are representative of market rents; Steele used rates less than the subject property's asking rents to calculate potential gross income. Bean relied on the subject property's

actual asking rents, other income, loss to lease, vacancy loss, and concessions. He concluded effective gross income of $542,665 for 2009 and $545,917 for 2010. Steele relied on rent comparables, the subject property actual "other income," and a five percent vacancy rate for effective gross income of $545,793. The court accepts as reasonable the subject property's actual income and finds that the effective gross income was $545,000 as of January 1, 2010.

The parties disagree with respect to operating expenses. Bean relied on the subject property actual expenses which, as a percentage of effective gross income and excluding property taxes, ranged from 45.48 to 51.09 percent between 2007 and 2010. On a per unit basis, the subject property expenses ranged from $4,327 to $4,946 per unit; on a per square foot basis, the subject property expenses ranged from $4.08 to $4.71 per square foot. Bean noted that the subject property actual expenses are within the range of expenses identified by the Metro Multifamily Housing Association report: $3,221 to $4,175 per unit and $3.42 to $7.71 per square foot. Bean noted that the subject property expenses may be higher because of the layout of the property in four-plexes and because of its relatively low density. Bean also included replacement reserves of $250 per unit, or $15,000. Steele determined expenses of 35 percent, including reserves, based on two market surveys. Steele's expense ratio conclusion is based on older data from 2007 and 2008, as well as expenses for class A and class B properties, suggesting that the subject property expenses would be higher than those reported by Steele's market surveys. The court finds that the subject property expenses were 46 percent as of January 1, 2010, and accepts Bean's 2.5 percent for reserves for replacement. Thus, the court finds that the subject property NOI was $280,675.

"A cap[italization] rate is generally calculated using market sales. Slight deviations in cap[italization] rates profoundly change the estimated value of a property, making the proper

calculation of the rate of paramount importance." *Allen*, 17 OTR at 260. The parties also disagree with respect to an appropriate capitalization rate for the subject property as of January 1, 2010. Bean considered both actual sales in East Portland/Gresham (rates reportedly ranged from 7.71 to 11.80 percent) and market surveys (rates reportedly ranged from 6.2 to 11.8 percent) and he concluded a capitalization rate of 8.50 percent for the subject property, to which he added a property tax rate of 1.55 percent for an overall rate of 10.05 percent. Steele determined a capitalization rate of 7.00 percent based on actual comparable sales with rates ranging from 6.25 to 7.31 percent and market surveys reporting capitalization rates ranging from 6.00 to 7.78 percent. Steele considered the 7.00 capitalization rate of his sale 1, Meadowlands, especially persuasive in selecting a capitalization rate. Steele added a property tax rate of 1.55 percent for an overall rate of 8.55 percent.

Bean testimony concerning his sources for reporting capitalization rates from actual sales was confusing and raised some questions about the reliability of that information. The court is not persuaded that the 7.00 percent capitalization rate from the June 2011, sale of a 168-unit property is the best evidence of the subject property's capitalization rate as of January 1, 2010. The subject property was built in 1990 and is reasonably well-maintained. The court finds that a reasonable capitalization rate for the subject property as of January 1, 2010, was 7.50 percent. Including the property tax rate of 1.55 percent reported by both Bean and Steele, the court finds that the overall rate applicable to the subject property was 9.05 percent for an indicated value of $3,100,000, rounded, under the income approach.

B.    *Sales comparison approach*

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions * * *."

OAR 150-308.205-(A)(2)(c). "The court looks for arm's-length sale transactions of property similar in size, quality, age and location * * * in order to determine the [real market value]" of the subject property. *Richardson*, WL 21263620 at *3 (Mar 26, 2003).

Bean completed a "market data analysis" in which he used NOI as a substitute for adjustments and developed an indicated value per unit and indicated value per square foot for each comparable sale identified. In support of his methodology, Bean provided an article from the July 1990 issue of *The Appraisal Journal*. Gary L. Bernes, MAI, & Phillip S. Mitchell, MAI, *An Analysis of Indicators of Multi-Family Complex Values*, APPRAISAL JOURNAL, July 1990, at 379. In a recent decision, this court discussed the reliability of Bean's "market data analysis" and concluded that "Plaintiff offered no statute or administrative rule that authorizes or states that a market data analysis is equivalent to or a substitute for a sales comparable approach." *Confehr*, TC-MD No 110621D at 13. Furthermore, Bean testified that he is not an appraiser and cannot, therefore, testify that his "market data analysis" methodology is an accepted appraisal technique.

Steele determined values of $70,000 per unit and $70 per square foot under the sales comparison approach, for values of $4,200,000 (based on units) $4,140,000 (based on square feet). Steele gave more weight to the price per square foot and concluded a value of $4,140,000 for the subject property under the sales comparison approach. The court found that Steele's explanation of his "adjustments" for age, quality, and condition suggests some overlap in the adjustments. Three of the six types of "adjustments" that Steele made to his comparable sales appear to overlap and reflect the same "adjustment" counted multiple times. The court finds Steele's "adjustments" and value conclusions under his sales comparison approach to be

/ / /

unpersuasive. Because Steele's sale comparison approach is inconclusive, the court cannot determine a real market value for the subject property based on that approach.

III. CONCLUSION

After careful consideration of the testimony and evidence presented, the court finds that the subject property real market value as of January 1, 2010, was $3,100,000. Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of property identified as Account R121692 was $3,100,000 for the 2010-11 tax year.

Dated this ____ day of April 2012.

_____
ALLISON R. BOOMER
MAGISTRATE PRO TEMPORE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Pro Tempore Allison R. Boomer on April 25, 2012. The Court filed and entered this document on April 25, 2012.*