IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

CLARK P. BLOWERS )
and CL DUBOIS BLOWERS, )
)
Plaintiffs, ) TC-MD 120230N
)
v. )
)
JACKSON COUNTY ASSESSOR, )
)
Defendant. ) **DECISION**

Plaintiffs appeal the real market value of property identified as Account 10365315

(subject property) for the 2011-12 tax year. A telephone trial was held on September 5, 2012.

Clark P. Blowers (Blowers), owner of the subject property, appeared and testified on behalf of

Plaintiffs. David Arrasmith (Arrasmith), Deputy Assessor, appeared and testified on behalf of

Defendant. Plaintiffs' Exhibits 1 through 5, also submitted with Plaintiffs' Complaint, were

received without objection. Defendant's Exhibit A was received without objection.

I.  STATEMENT OF FACTS

The subject property is an apartment complex with 11 units in three buildings situated on

0.45 acres in Medford, Oregon. (Def's Ex A at 4.) The three buildings are identified as 825,

835, and 845, the addresses of each building. (*Id.*) Buildings 825 and 835 each include four

one-bedroom, single-story units and building 845 includes three two-bedroom, two-story units.

(*Id.* at 4, 6, 11-12.) The subject property improvements were built in 1993. (*Id.* at 4.) The

subject property includes two carports and an asphalt parking area. (*Id.* at 6.) Blowers testified

that the subject property is in "disrepair."

Plaintiffs provided the 2010 rent rolls for the subject property as well as an "Owner

Statement" detailing income and expenses for the subject property from January 1, 2010, through

December 31, 2010. (Ptfs' Ex 4-5.) Arrasmith relied on the income and expense information provided by Plaintiffs for his income analysis. (Def's Ex A at 11.) Actual monthly rent received for each of the 11 subject property units varied from month to month and from unit to unit. (*See* Ptfs' Ex 4.) For instance, "rent collected" for "Unit D" in building 825 ranged from $464.80 to $540.00 in 2010 and "rent collected" for "Unit B" in building 835 ranged from $256.00 to $510.00 in 2010. (*Id.* at 4, 8.) Excluding vacancies, "rent collected" for one-bedroom units in buildings 825 and 835 ranged from $104.00 to $600.00. (*Id.*) Excluding vacancies, "rent collected" for two-bedroom units in building 845 ranged from $520.00 to $610.00. (*Id.* at 11.) No explanation was provided for those variations in actual rent.[1]

Blowers determined the 2011-12 real market value of the subject property using a gross rent multiplier method. (Ptfs' Ex 3 at 2.) He calculated total yearly income of $68,036.76, including vacancy of 4.55 percent or $3,243.24. (*Id.*) Blowers determined a gross rent multiplier of seven percent based on a summary of five apartment sales in Jackson County provided by Defendant at the board of property tax appeals (board) hearing. (*See* Ptfs' Ex 2 at 2.) The county documents states the gross rent multiplier "indicated range" to be 7.65 to 8.13 with an average of 7.89. (*Id.*) It further states: "Given the subjects overall quail[]ty relative to the comparables a GRM at the upper end of the range (7.75-8.0) is warr[a]nted. At a gross income of 77,700 the indicated value range is $600,000 to $621,600." (*Id.*) Using a gross rent multiplier of seven, Blowers calculated real market value of $476,257.32. (Ptfs' Ex 3 at 2.)

Arrasmith testified that he disagreed with Blowers' gross rent multiplier of seven, which appeared to be based on Blowers' determination that the subject property is inferior to the "Royal Court" apartment in Medford. (*See* Ptfs' Exs 2 at 2, 3 at 7-8.) Arrasmith testified that

---

[1] Arrasmith testified that he was never allowed a physical inspection of the subject property by Plaintiffs and that he was not provided any explanation for the differences in rent collected for each unit.

the "Royal Court" sale and the other four sales identified in Plaintiffs' Exhibit were provided by Defendant at the board hearing. (Ptfs' Ex 2 at 2.) Arrasmith testified that he did not provide those sales and did not verify them. He testified that, when using the gross rent multiplier, gross income rather than effective gross income should be used; Blowers erred when he subtracted vacancy from his gross rent calculation. (*See* Ptfs' Ex 3 at 2.)

Arrasmith determined that "[t]he existing improvement is an apartment complex that reflects the highest and best use [of the subject property] as improved." (Def's Ex A at 10.) Arrasmith considered, but ultimately rejected, the cost approach and the sales comparison approach, based on "the old age of the subject" property and "the lack of comparable sales[,]" respectively. (*Id.* at 1.) He relied on the direct capitalization income approach. (*Id*. at 1, 11.)

Based on December 2010 actual rent for the subject property, Arrasmith calculated that total monthly rent was $6,070 and average monthly rent was $552. (Def's Ex A at 11-12.) He used that figure to calculate potential gross income of $72,864 for the subject property. (*Id.* at 14.) Arrasmith relied on the vacancy rates reported during the fourth quarter 2010 by the Southern Oregon Rental Owners Association (SOROA) and determined a market vacancy rate of 4.47 percent and effective gross income of $69,607.[2] (*Id.* at 12, 14.) Arrasmith testified that he relied on actual operating expenses provided by Plaintiffs and determined operating expenses,[3] not including property taxes, of $19,155 for 2010. (*See id.* at 14, 26-33.) He also included as an expense 2.0 percent reserve for replacements, for total operating expenses of $20,547 and net operating income of $49,060. (*Id.* at 14.)

---

[2] Plaintiffs provided the "SOROA Vacancy Report" from January 1997 through February 2012. (Ptfs' Ex 3 at 3-6.) From January through December 2010, vacancy ranged from 3.93 to 6.60 percent. (*Id.* at 5.) Vacancy in January 2011 was 5.49 percent. (*Id.*)

[3] Arrasmith identified the following categories of operating expenses: maintenance, management, insurance, gardening, electricity, and trash/sewer/water. (Def's Ex A at 14.)

To determine a capitalization rate, Arrasmith relied on a 2009 study and reappraisal by Jackson County of "all apartments in the county." (Def's Ex A at 13.) That study revealed that "local capitalization rates for apartments ranged from 5.15% to 7.15% with an average at 6.15%." (*Id.*) Arrasmith also considered fourth quarter 2010 capitalization rates reported by PricewaterhouseCoopers: 6.58 percent for "Pacific Region" apartments and 6.51 percent for the "National Market average" of apartments. (*Id.*) Arrasmith testified that he used a capitalization rate of 6.5 percent to which he added a tax rate of 1.06 percent for an overall rate of 7.56 percent. (*See id.* at 13-14.) He concluded that the 2011-12 real market value of the subject property under the income approach was $648,700, rounded. (*Id.* at 14.)

Blowers testified that the total actual rents collected for the subject property in 2010 were $65,963. (*See* Ptfs' Ex 4.) He testified that that figure is more reliable than Arrasmith's effective gross income of $69,607. Blowers testified that he generally agrees with the operating expenses used by Arrasmith. He testified that total operating expenses for the subject property for 2010, including property taxes, were $28,698 for net operating income of $37,265. Blowers testified that he considered Arrasmith's capitalization rate of 6.5 percent to be too low given the condition of the subject property. Blowers testified that, based on conversations with numerous realtors, he considered a capitalization rate of 7.5 percent to be reasonable.

The 2011-12 roll real market value of the subject property is $597,820. (Ptf's Compl at 2.) The 2011-12 real market value of the subject property was sustained by the board. (*Id.*) The 2011-12 maximum assessed value is $665,540. (*Id.*) Plaintiff requests a 2011-12 real market value of $476,257.32. (*Id.* at 1.) In its Answer, Defendant requested that the 2011-12 real market value of the subject property be increased to $740,300. At trial, Defendant amended

///

its request, based on its evidence, to increase the 2011-12 real market value of the subject property to $648,700.

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2011-12 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citations omitted). Real market value is defined in ORS 308.205(1),[4] which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2011-12 tax year was January 1, 2011. ORS 308.007; ORS 308.210.

The real market value of property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). The three approaches of value that must be considered are: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. OAR 150-308.205-(A)(2)(a). Although all three approaches must be considered, all three approaches may not be applicable in a given case. *Id.* Both parties relied solely upon the income approach.[5] "The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that

---

[4] All references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to 2009.

[5] Plaintiffs relied on a gross rent multiplier method, which is a "subset of the income approach." *Allen v. Dept of Rev.*, 17 OTR 248, 253 (2003). "For income producing properties such as the subject, effective gross income may be used to calculate an opinion of value by applying a relevant gross income multiplier or gross rent multiplier." *Id.* at 263 (citing Appraisal Institute, *The Appraisal of Real Estate* 546 (12th ed 2001)).

reflects the future income stream it produces." *Allen v. Dept of Rev.* (*Allen*), 17 OTR 248, 253 (2003) (citations omitted). The subject property is an income producing property and the court agrees that the income approach provides persuasive evidence of the 2011-12 real market value of the subject property.

Plaintiffs have the burden of proof and must establish their case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). "[I]t is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.,* 18 OTR 324, 332 (2005) (citing *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (citation omitted)). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

Plaintiffs rely on Blowers's value determination using the gross income multiplier method. "As a method related to direct capitalization, [the gross income multiplier] bears the same cautions in relation to the importance of comparability of properties." *Allen*, 17 OTR at 264. Blowers determined a gross income multiplier for the subject property based on five apartment sales that Defendant provided to the board. Arrasmith testified that he did not provide those sales to the board and did not confirm them. Although Blowers relied on sales provided Defendant, he did not accept Defendant's gross income multiplier range of "7.75-8.0" and, instead, used a multiplier of 7. Blowers provided no evidence in support of his gross income multiplier and, as a result, the court finds his real market value conclusion unreliable.

Plaintiffs did not prove by a preponderance of the evidence that the 2011-12 real market value of the subject property was $476,257.32. Even though the burden has not shifted under ORS 305.427, the court has jurisdiction to determine the "real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412. Defendant requests that the real market value of the subject property be increased to $648,700 (rounded). In support of that requested value, Defendant presented evidence of value using the direct capitalization income approach.

"The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income * * *." *Allen*, 17 OTR at 253. "[Net operating income] is the currently expected net income of a property after all operating expenses are deducted from gross income. * * * To calculate the [net operating income], appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data." *Id*. at 254 (citation omitted).

"[T]he income approach should be based on enough historical data so that a normalized expected income can be determined with confidence. Most experts believe that three to five years, preferably longer, of income experience are needed to make such an estimate." *Confehr v. Multnomah County Assessor* (*Confehr*), TC-MD No 110621D at 14 (Feb 27, 2012) (citing *Bauman et al v. Dept. of Rev*., 6 OTR 426, 433 (1976) (citations omitted)). Arrasmith relied on actual income and expense data for the subject property from 2010 provided by Plaintiffs. He was unable to consider income and expense data from 2008 and 2009 because Plaintiffs declined to provide that information. (Def's Ex A at 13.) Arrasmith determined a vacancy rate of 4.47 percent based on the SOROA vacancy report and concluded effective gross income of $69,607. Blowers criticized Arrasmith's determination of effective gross income, arguing that Arrasmith

should have relied on actual rents collected in 2010. As noted by Arrasmith and the court, the actual rents collected for the subject property in 2010 varied significantly from month to month and from unit to unit; no explanation was provided for that variation. Arrasmith's potential gross income of $72,864 is supported by the actual income data provided. His vacancy rate of 4.47 percent is supported by the SOROA market vacancy report. The court finds Arrasmith's effective gross income of $69,607 is reasonable and supported by the evidence.

Arrasmith relied on actual operating expenses for the subject property, excluding property taxes, which he determined to be $19,155 in 2010. Blowers testified that he generally agreed with Arrasmith's operating expenses. The court finds Arrasmith's expenses are supported by the actual operating expenses and accepts his net operating income of $49,060.

"A cap[italization] rate is generally calculated using market sales." *Allen*, 17 OTR at 260. Arrasmith concluded a capitalization rate of 6.5 percent, and overall rate of 7.56 percent, based on a 2009 study and reappraisal of apartments in Jackson County and fourth quarter 2010 market data from the Pacific Northwest apartment market. Blowers criticized Arrasmith's capitalization rate, testifying that, based on conversations with numerous realtors, a capitalization rate of 7.5 percent was more appropriate. Arrasmith's capitalization rate, which is based on data from the same market area as the subject property, is reasonable and supported by the evidence. Blowers did not offer any evidence in support of his opinion that the capitalization rate should be 7.5 percent. "Personal conclusions with no basis in actual market data are entitled to little or no weight." *McKee v. Dept. of Rev.*, 18 OTR 58, 64 (2004). Blowers failed to provide reliable evidence in rebuttal of Arrasmith's capitalization rate conclusion.

The court finds that Defendant proved by a preponderance of the evidence that the 2011-12 real market value of the subject property was $648,700 (rounded).

III.  CONCLUSION

After carefully considering the testimony and evidence presented, the court finds that Plaintiffs failed to carry their burden of proof that the 2011-12 real market value of the subject property was $476,257.32.  Under ORS 305.412, the court has jurisdiction to determine the real market value of the subject property on the basis of the evidence before the court.  The court finds that Defendant proved by a preponderance of the evidence that the 2011-12 real market value of the subject property was $648,700.  Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of property identified as Account 10365315 was $648,700 for the 2011-12 tax year.

Dated this ____ day of November 2012.

ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Allison R. Boomer on November 19, 2012.  The Court filed and entered this document on November 19, 2012.*